# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## ON REHEARING

## NO. 03-09-00005-CV

**City of Waco, Appellant**

**v.**

**Texas Commission on Environmental Quality, Appellee**

## FROM THE DISTRICT COURT OF TRAVIS COUNTY, 201ST JUDICIAL DISTRICT NO. D-1-GV-08-000405, HONORABLE DARLENE BYRNE, JUDGE PRESIDING

## O P I N I O N

We withdraw the panel opinion and judgment dated September 17, 2010, and substitute the following in its place. The motion for en banc reconsideration filed by appellant, the City of Waco (City), is dismissed as moot.

This administrative appeal presents several questions concerning third-party standing to obtain contested-case hearings in Texas Commission on Environmental Quality (Commission[1]) permitting proceedings that are governed by subchapter M of water code chapter 5. *See* Tex. Water Code Ann. §§ 5.551-.558 (West Supp. 2010).[2] The City challenges a Commission order denying its

---

[1] For clarity, and because any distinctions are not material to our analysis, we will also use "Commission" to refer to the TCEQ's predecessor agencies.

[2] Except where there have been material intervening substantive changes, we cite to the current versions of statutes and rules for convenience.

request for a contested-case hearing regarding the proposed issuance of a water-quality permit and a district court's judgment affirming the Commission's order. For the reasons explained herein, we conclude that the Commission's order must be reversed as arbitrary and an abuse of discretion.

## BACKGROUND

In that way that seems unique to Texas jurisprudence,[3] this case presents significant and complex administrative law issues that arise from a dispute about cow manure—specifically, that generated by cattle at a dairy, located northwest and upriver from the City, known as the O-Kee Dairy. Because of the considerable volumes of manure and other animal waste generated by such facilities and the propensity of such waste to end up in surface or ground water, "concentrated animal feeding operations" (CAFOs)—which include dairies that confine and feed two-hundred or more cattle for extended periods in areas that do not sustain vegetation—are legally considered "point sources" of water pollution, and must obtain water-quality permits. *See* 30 Tex. Admin. Code §§ 321.31, .32(3), (13), (58), .33 (West 2011) (Texas Comm'n on Envtl. Quality, CAFOs). These "CAFO permits," generally speaking, require the dairies who hold them to maintain "retention control structures" (RCSs)—basically ponds to collect runoff of manure and wastewater from the areas where cows are confined—with capacities sufficient to prevent the waste from discharging except during certain large rainfall events. However, dairy CAFO operators are allowed, subject to certain restrictions, to discard their animal waste by applying it as fertilizer to grow crops on acreage termed "waste application fields" (WAFs), a method that is not considered a "discharge" of

---

[3] *See generally, e.g.*, *Bennett v. Reynolds*, 315 S.W.3d 867 (Tex. 2010) (addressing due-process limitations on punitive damages awards; award was predicated on jury findings of cattle rustling).

2

the waste. This proceeding arises from an application by the O-Kee Dairy's owner and operator to amend an existing CAFO permit to expand the dairy's maximum allowable number of cows from 690 to 999 and its total waste-application acreage from 261 to 285.4 acres. Because the procedures through which the Commission considers such amendments—in particular, public-participation requirements—are central to the issues on appeal, we first review the key statutes and rules that prescribe those procedures before turning to the Commission's application of them here.

**Public-participation requirements**

The procedures by which dairy CAFOs obtain new or amended permits with respect to water quality are governed in the first instance by chapter 26 of the water code, which governs water-quality permits generally. *See* Tex. Water Code Ann. §§ 26.001-.562 (West 2008). Under chapter 26, the Commission is required to give public notice of a permit application and, if requested by a commissioner, the Commission's executive director, or "any affected person," hold a "public hearing" on the application. *Id*. § 26.028(a), (c), (h). Exempt from the requirement of an opportunity for public hearing, however, are applications to amend or renew a water-quality permit that do not seek either to "increase significantly the quantity of waste authorized to be discharged" or "change materially the pattern or place of discharge," if "the activities to be authorized . . . will maintain or improve the quality of waste authorized to be discharged," and meet certain other requirements. *Id.* § 26.028(d).

To the extent that chapter 26 requires public notice or an opportunity for public comment or hearing in regard to a permit application, the Legislature has prescribed detailed procedures governing such notice or opportunity in chapter 5, subchapter M, of the water code. *See*

3

*id.* §§ 5.551, .558. Enacted in 1999,[4] subchapter M—which also governs applications for injection-well and certain solid-waste disposal permits, *see id.* § 5.551(a)—requires public notice of an applicant's intent to obtain a permit once the Commission's executive director declares the application to be administratively complete. *See id.* § 5.552. The executive director then conducts a technical review of the permit application and issues a preliminary decision. *Id.* § 5.553(a). The preliminary decision triggers a second round of public-notice requirements and a public-comment period of a duration set by Commission rule. *See id.* § 5.553(b), (c). During the public-comment period, the executive director may also hold a public meeting on the permit application and must do so if, among other things, he "determines that there is substantial public interest in the proposed activity." *See id.* § 5.554. Following the conclusion of the public-comment period, the executive director must file a response "to each relevant and material public comment on the preliminary decision filed during the public comment period." *See id.* § 5.555.

After the executive director files his response to any public comments, subchapter M and the Commission's rules provide an opportunity for interested persons to request reconsideration of the executive director's preliminary decision and to request a contested-case hearing under the Administrative Procedure Act.[5] *See id.* § 5.556; 30 Tex. Admin. Code § 55.201 (West 2011) (Texas Comm'n on Envtl. Quality, Requests for Reconsideration or Contested Case Hearing). Exempt from this requirement, however, are several categories of permit applications that include

---

[4] *See* Act of May 30, 1999, 76th Leg., R.S., ch. 1350, § 2, 1999 Tex. Gen. Laws 4570 (codified at Tex. Water Code Ann. §§ 5.551-.558 (West Supp. 2010)).

[5] The Administrative Procedure Act (APA) is codified in title 10, subtitle A, chapter 2001 of the Texas Government Code. *See* Tex. Gov't Code Ann. §§ 2001.001-.902 (West 2008).

"minor" permit amendments—those that improve or maintain the permitted quality of the waste discharge, *see id.* §§ 55.201(i), 305.62(c)(2) (West 2011) (Texas Comm'n on Envtl. Quality, Consolidated Permits); *see also* Tex. Water Code Ann. § 26.028(d) (statutory exemption from "public hearing" requirement)—as contrasted with "major" amendments, which the Commission has defined as those that change a "substantive term, provision, requirement or limiting parameter of a permit." *See* 30 Tex. Admin. Code § 305.62(c)(1). As for those categories of permit applications where an opportunity for contested-case hearing is required, the Commission must grant a hearing request only if the request is made by its executive director or the permit applicant, *see id.* § 55.211(c)(1) (West 2011), or, in certain circumstances, if made by a third party who is an "affected person," *see* Tex. Water Code Ann. § 5.556(a)-(e); 30 Tex. Admin. Code §§ 55.201, .211(c)(2); *see also* Tex. Water Code Ann. § 26.028(c) (Commission, "on the request of . . . any affected person, shall hold a public hearing on the application for a permit, permit amendment, or renewal of a permit."). Conversely, the Commission is expressly prohibited from granting a contested-case hearing request unless it "determines that the request was filed by an affected person as defined by [water code] Section 5.115," Tex. Water Code Ann. § 5.556(c), subject to its discretion to grant a hearing "if it determines that the public interest warrants doing so," *see id.* § 5.556(f); 30 Tex. Admin. Code § 55.211(d)(1). In instances where the Commission has granted a contested-case hearing request, the Legislature has authorized it to delegate the task of conducting the hearing itself to the State Office of Administrative Hearings (SOAH). *See* Tex. Water Code Ann. § 5.311 (West Supp. 2010).

Water code section 5.115 currently defines "affected person" as follows:

5

For the purpose of an administrative hearing held by or for the commission involving a contested case, "affected person," or "person affected," or "person who may be affected" means a person who has a personal justiciable interest related to a legal right, duty, privilege, power, or economic interest affected by the administrative hearing. An interest common to members of the general public does not qualify as a personal justiciable interest.

*Id.* § 5.115(a) (West Supp. 2010). The Commission's pertinent rules incorporate the same definition. *See* 30 Tex. Admin. Code §§ 55.103 (West 2011) (Texas Comm'n on Envtl. Quality, Requests for Reconsideration and Contested Case Hearings; Public Comment) ("[A]ffected person" with respect to permit application "has a personal justiciable interest related to a legal right, duty, privilege power, or economic interest affected by the [permit] application. An interest common to members of the general public does not qualify as a personal justiciable interest."), .203(a) (West 2011) (Texas Comm'n Envtl. Quality, Determination of Affected Person) (same).

In water code section 5.115, the Legislature additionally mandated that the Commission "shall adopt rules specifying factors which must be considered in determining whether a person is an affected person in any contested case arising under the air, waste, or water programs within the commission's jurisdiction and whether an affected association is entitled to standing in contested case hearings." Tex. Water Code Ann. § 5.115(a). Pertinent to this appeal, the Commission has promulgated the following rule:

In determining whether a person is an affected person, all factors shall be considered, including, but not limited to, the following:

(1) whether the interest claimed is one protected by the law under which the application will be considered;

(2) distance restrictions or other limitations imposed by law on the affected interest;

6

(3)     whether a reasonable relationship exists between the interest claimed and the activity regulated;

(4)     likely impact of the regulated activity on the health and safety of the person, and on the use of property of the person;

(5)     likely impact of the regulated activity on use of the impacted natural resource by the person; and

(6)     for governmental entities, their statutory authority over or interest in the issues relevant to the application.

30 Tex. Admin. Code § 55.203(c). Related to the final factor, the Commission has further provided that "[g]overnmental entities, including local governments and public agencies, with authority under state law over issues raised by the application may be considered affected persons." *Id.* § 55.203(b).

We additionally note—as it later becomes relevant to our analysis—that the current versions of section 5.115 and related Commission rules differ from those we construed in our prior precedents addressing contested-case hearing requests before the Commission. *See Collins v. Texas Natural Res. Conservation Comm'n*, 94 S.W.3d 876, 881-82 (Tex. App.—Austin 2002, no pet.); *United Copper Indus. v. Grissom*, 17 S.W.3d 797, 800-03 (Tex. App.—Austin 2000, pet. dism'd); *Heat Energy Advanced Tech., Inc. v. West Dallas Coal. for Envtl. Justice*, 962 S.W.2d 288, 289, 294-95 (Tex. App.—Austin 1998, pet. denied) (*HEAT*). At the time pertinent to those decisions, section 5.115 and Commission rules required hearing requestors to demonstrate not only that they possessed a "personal justiciable interest" in the permit application so as to be an "affected person," but also that their request was "reasonable" (considering such factors as whether the project would decrease emissions or discharges of pollutants and "the extent to which the person requesting a hearing is likely to be impacted by the emissions, discharge, or waste") and that it was supported

7

by "competent evidence." *See* Act of May 28, 1995, 74th Leg., R.S., ch. 882, § 1, 1995 Tex. Gen. Laws 4380, 4381; 30 Tex. Admin. Code §§ 55.27(b)(2), .31; *see Collins*, 94 S.W.3d at 881-82; *United Copper*, 17 S.W.3d at 800-01; *HEAT*, 962 S.W.2d at 289, 294-95. The Legislature deleted the "reasonableness" and "competent evidence" requirements in 1999—in the same legislation in which it added subchapter M to water code chapter 5. *See* Act of May 30, 1999, 76th Leg., R.S., ch. 1350, § 1, 1999 Tex. Gen. Laws 4570 (codified at Tex. Water Code Ann. § 5.115).

In addition to prohibiting the Commission from granting hearing requests of third parties who are not "affected persons," subchapter M restricts the Commission from referring an issue to SOAH for a contested-case hearing unless the Commission determines that the issue (1) involves a disputed question of fact (2) that was raised during the public-comment period and (3) that is "relevant and material" to its decision on the permit application. *See* Tex. Water Code Ann. § 5.556(d). In the event it grants a hearing request, the Commission is additionally directed "to limit the number and scope of the issues" it refers to SOAH. *Id.* § 5.556(e).

The water code does not prescribe a particular procedure through which the Commission is to decide requests for contested-case hearings and determine whether the requestor is an "affected person" entitled to one. *See id*. §§ 5.115, .556. The Commission's rules, however, specify that a person seeking a contested-case hearing must file a written hearing request within a specified period following the executive director's response to public comments, that the request "may not be based on an issue that was raised solely in a public comment withdrawn by the commenter" before the executive director filed his response to public comments, and that the request must "substantially comply" with rules specifying certain required contents. 30 Tex. Admin. Code § 55.201(a), (c), (d), (i). Among these required contents, the request must "list all relevant and

8

material disputed issues of fact that were raised during the public comment period that are the basis for the hearing request," and "identify the person's personal justiciable interest affected by the application, including a brief, but specific, written statement explaining in plain language the requestor's location and distance relative to the proposed facility or activity that is the subject of the application and how or why the requestor believes he or she will be adversely affected by the proposed facility or activity in a manner not common to members of the general public." *See id.* § 55.201(d)(2), (4).

Once a contested-case hearing request is filed, a "response" may be filed by the executive director, the director of the Commission's Office of Public Assistance, or the applicant. *See id.* § 55.209(d) (West 2011). Any such response must specifically address "whether the requestor is an affected person[,] which issues raised in the hearing request are disputed[,] whether the dispute involves questions of fact or of law[,] whether the issues were raised during the public comment period[,] whether the hearing request is based on issues raised solely in a public comment [that was] withdrawn[, and] whether the issues are relevant and material to the [Commission's] decision on the application . . . ." *Id*. § 55.209(e)(1)-(6). The hearing requestor then has the right to file and serve a "written repl[y] to a response." *See id.* § 55.209(g).

The rules then direct the Commission to "evaluate" the hearing request and provide it four basic options. *See id.* § 55.211(b)-(d). First, the Commission "may . . . determine that a hearing request meets the requirements of this subchapter," and "shall" grant the request if made by an "affected person" and the request (1) is timely filed, (2) "is pursuant to a right to hearing authorized by law," (3) complies with the form and content requirements of rule 55.201, and (4) "raises disputed issues of fact that were raised during the [public] comment period, that were not

9

withdrawn . . . and that are relevant and material to the [C]ommission's decision on the application." *See id.* § 55.211(b)(3), (c). In that instance, the Commission must refer the disputed relevant and material fact issues to SOAH for a contested-case hearing. *See id.* § 55.211(b)(3). The Commission's second option is to "determine that the hearing request does not meet the requirements of this subchapter," and proceed to act on the permit application without a hearing. *See id.* § 55.211(b)(2). Its third option is to refer the hearing request itself to SOAH for a contested-case hearing and recommendation "on the sole question of whether the requestor is an affected person." *See id.* § 55.211(b)(4). Finally, apart from these requirements, the Commission has discretion to grant a hearing request in the "public interest." *See id.* § 55.211(d).

Although the Commission's "evaluation" of the hearing request may result in the referral of the request to SOAH for a limited contested-case hearing or the granting of a contested-case hearing on the merits of the permit application, the Commission's rules specify that its evaluation of the request "is not itself a contested case subject to the APA." *See id.* § 55.211(a).

**The present proceeding**

The Commission staff classified the O-Kee Dairy permit application as seeking a "major" amendment to the dairy's existing water-quality permit, as opposed to a "minor" one that would be exempt for that reason from the requirement of an opportunity for a contested-case hearing. *See id.* §§ 55.201(i); 305.62(c). The executive director declared the O-Kee Dairy permit application administratively complete, conducted technical review, prepared a draft permit, and issued a preliminary decision that the draft permit, if issued, met all statutory and regulatory requirements. As the applicants had requested, the draft permit proposed to increase the dairy's maximum herd size

10

from 690 to 999 head and to expand its total waste application acreage from 261 to 285.4 acres. At the same time, however, the draft permit proposed to implement several new measures that Commission staff viewed as strengthening the overall water-quality protections at the facility, even considering the higher volumes of manure that would be produced by hundreds more cows. These included steps aimed at reducing the possibility of discharges from the dairy's RCSs by, among other things, more than doubling their total storage capacity to 21.9 acre-feet—a capacity estimated to accommodate rainfall and runoff from a ten-day rainfall volume that would be expected to occur once every 25 years—and improving monitoring of sludge and water levels. There were also new restrictions aimed at reducing the risk of waste from the WAFs entering the water supply, including limiting waste application in accordance with the phosphorus requirements of the crops and soil, rather than nitrogen requirements, which had an estimated effect of lowering by about 40 percent the amount of waste fertilizer that could be applied in the fields. The dairy was also required to expand the size of non-vegetative buffer zones around the WAFs and to transport any excess waste off-site.

The new measures purported to conform to numerous regulatory changes that had been imposed on Texas dairy CAFOs—and particularly dairy CAFOs located, like the O-Kee Dairy, northwest of Waco—during the years since the dairy had obtained its previous water-quality permit, which dated back to 1999. Although located a few miles from the river itself, the O-Kee Dairy is situated within the watershed of the North Bosque River, which rises from headwaters in Erath County, flows southeastward through Hamilton and Bosque Counties, and into McLennan County and the Waco city limits, where it joins two other branches of the Bosque and a creek in forming Lake Waco. During recent decades, the dairy industry within the North Bosque watershed has seen significant growth, bringing controversy among regulators, scientists, elected officials, and

11

members of the public regarding the extent to which increasing volumes of animal waste being produced by the dairies are damaging water quality in the North Bosque and, ultimately, Lake Waco. The City—for whom Lake Waco serves as a source of both its municipal water supply and its broader economic health—has been prominent among those advocating stricter regulatory limits on the dairies' operations before the Legislature, the Commission, and in other fora. Among other complaints, the City has blamed upstream dairies for causing perceived unpalatable taste and odor in its drinking water, as well as contributing pathogens that can endanger human health.

Several of the intervening regulatory changes stemmed from a 1998 determination by the Commission made to comply with the federal Clean Water Act, which requires that Texas "identify those waters within its boundaries for which the effluent limitations required by [the Act] are not stringent enough to implement any water quality standard applicable to such waters," 33 U.S.C. § 1313(d)(1)(A) (2001). The Commission determined that two segments of the North Bosque River above Lake Waco were "impaired" under "narrative" water-quality standards—qualitative, somewhat subjective assessments of "too much," in contrast to quantitative or numeric measures—"related to nutrients and aquatic plant growth." These were Segment 1255, which extends from the North Bosque's headwaters to a point just downstream from Stephenville, and Segment 1226—the area in which the O-Kee Dairy is located—which extends from the southeast end of Segment 1225 to the point where the river flows into Lake Waco.[6] The Commission's identification of the two segments of the North Bosque as "impaired" triggered an obligation on its part to determine for each a "total maximum daily load" (TMDL)—essentially a

---

[6] As the Commission emphasizes, however, Lake Waco itself has never been determined to be an "impaired" water body in regard to aquatic plants or any other criterion.

12

plan or budget that defines the maximum amount of a pollutant that the water body can receive and attain the applicable water-quality standard. *See id.* § 1313(d)(1)(C). Following study and public comment from persons that included the City, the Commission in 2001 determined that soluble phosphorus, which it attributed primarily to dairies' waste application fields and municipal water-treatment plants, was the key variable that could be controlled to limit algal plant growth in the North Bosque River, and approved TMDLs that proposed an overall fifty-percent reduction in soluble phosphorus loading over time. After further study and comment (including comments from the City), the Commission in 2002 proposed an implementation plan through which dairies and cities could reduce phosphorus loadings. In 2004, the Commission adopted rules making parts of the plan legally enforceable. *See* 29 Tex. Reg. 2550-2601 (Mar. 12, 2004).

Meanwhile, in 2001, the Legislature—at the City's urging—had imposed new environmental restrictions on dairy CAFOs located in a "major sole source impairment zone" (MSSIZ)—a term that, at the time of enactment, included only the North Bosque watershed above Lake Waco.[7] *See generally* Tex. Water Code Ann. §§ 26.501-.504. The restrictions and

---

[7] "Major sole source impairment zone" was defined as:

a watershed that contains a reservoir:

(1)    that is used by a municipality as a sole source of drinking water supply for a population, inside and outside of its municipal boundaries, of more than 140,000; and

(2)    at least half of the water flowing into which is from a source that, on the effective date of this subchapter, is on the list of impaired state waters adopted by the commission as required by 33 U.S.C. Section 1313(d), as amended:

13

requirements of this MSSIZ legislation included mandating that new or expanded CAFOs located within a MSSIZ obtain an individual water-quality permit—i.e., one tailored to the particular circumstances of the dairy—and barred regulation through a general permit. *See id.* § 26.503(a). Because general permits are among the types of permit that are exempt from the requirement of an opportunity for a contested-case hearing, *see* 30 Tex. Admin. Code § 55.201(i)(7), the MSSIZ legislation's requirement of individual permits had the effect of removing that exemption for CAFOs covered by the statute, thus opening their permitting proceedings to the potential for contested-case hearings.

The Environmental Protection Agency also adopted new rules and guidelines governing CAFOs that imposed stricter waste-application and record-keeping requirements. *See* National Pollutant Discharge Elimination System Permit Regulation and Effluent Limitation Guidelines and Standards for Concentrated Animal Feeding Operations (CAFOs), 68 Fed. Reg. 7176-7274 (Feb. 12, 2003). The Commission, in turn, promulgated rule amendments purporting to implement the MSSIZ legislation, the new stricter federal requirements, and other changes aimed at strengthening environmental protections at dairy CAFOs and particularly those located in the North Bosque watershed. *See* 27 Tex. Reg. 1511-33 (Mar. 1, 2002) (amending 30 Tex. Admin. Code §§ 321.31-.35, .39, .48., .49 (West 2011)); 29 Tex. Reg. 6652-6723 (July 9, 2004)

---

(A)   at least in part because of concerns regarding pathogens and phosphorus; and

(B)   for which the commission, at some time, has prepared and submitted a total maximum daily load standard.

Tex. Water Code Ann. § 26.502 (West 2008).

(amending 30 Tex. Admin. Code §§ 321.31-.49) (West 2011)). The net effect was that the O-Kee Dairy's amended water-quality permit had to incorporate more stringent water-protection requirements than its previous one.

The City timely submitted numerous comments in opposition to the proposed permit[8] and requested a public meeting, which the executive director granted. Following the public meeting, the executive director filed his responses to public comment. With respect to the City's complaints, which he grouped into thirty-one specific comments or sets of comments, the executive director agreed to make five changes to permit provisions governing waste application in the dairy's WAFs or off-site, but otherwise rejected the City's legal and factual assertions.

The City then timely filed a written request for a contested-case hearing that incorporated its prior comments, replied to the executive director's responses, and delineated the legal and factual issues it considered to be in dispute. *See* 30 Tex. Admin. Code § 55.201(a), (c), (d). Purporting to act both in its own behalf and as *parens patriae* for its citizens, the City invoked the right of an "affected person" to obtain a contested-case hearing on a "major amendment" to the O-Kee Dairy's water-quality permit. *See id.* § 55.201(b)(4), (i); *id.* § 305.62(c)(1), (2). To comply with the requirement that it "identify [its] personal justiciable interest affected by the application, including a brief, but specific, written statement explaining in plain language [its] location and distance relative to the proposed facility or activity . . . and how and why [it] believes [it] will be adversely affected by the proposed facility or activity in a manner not common to members of the general public," *see id.* § 55.201(d)(2), the City presented four pages of argument that attached and

---

[8] The sole other public comment came from a landowner near the dairy who was concerned about swarming flies.

15

incorporated two affidavits—one from a professional engineer, Bruce L. Wiland, whom the City

presented as an expert in water-quality analysis, the other from the engineer who serves as the City's

water-utility director, Richard L. Garrett. The Wiland affidavit attached and incorporated roughly

two-hundred pages of research studies on which the expert relied as support for his opinions. The

City's assertions concerning its personal justiciable interest in the O-Kee Dairy permit application,

which essentially track the assertions and opinions of the two experts, can be summarized as follows:

- The City possesses a personal justiciable interest in the quality of the water in Lake Waco because it owns all adjudicated and permitted rights to the water impounded in the lake and uses the water as its sole source of supply for its municipal water utility, exclusive of emergency connections. The City must treat the water to ensure that it is safe for uses that include drinking and bathing and that it will be regarded as palatable by the customers to whom the City sells the water, including 113,000 City residents, approximately 45,000 residents of surrounding municipalities, and major industrial customers "that place a premium on the quality of the water they use." Otherwise, the City is placed at a competitive disadvantage in preserving and growing its water-utility customer base and, ultimately, its broader economic health.

- For many years, the City has received complaints about offensive taste and odor in its drinking water. The source of these problems has proven to be a geosmin (earthy odor) produced by decaying algae that grows in Lake Waco during warm weather. Beginning in the 1980s, Lake Waco began to experience more frequent and longer durations of algal blooms, with correspondingly more taste and odor problems in the City's drinking water. To counter these problems, the City has incurred escalating costs in attempting to treat the water. Despite these additional expenditures, current treatment methods (chiefly, the use of powdered activated carbon) have repeatedly fallen short of eliminating the geosmin, necessitating that the City deliver offensive smelling and tasting water to customers for the time being and that it plan and budget to install different and more expensive water-treatment systems in the future.

- There is a causal linkage between the increasing algal growths in Lake Waco (and resultant taste and odor problems in the City's drinking water) and phosphorus loading from dairies upstream in the North Bosque watershed. The North Bosque contributes approximately 64 percent of the total flow into Lake Waco and over 72 percent of the total phosphorus loading to the lake. Between 30 to 40 percent of the lake's total phosphorus load is attributable to dairy operations in the North Bosque watershed, most of which stems

16

from runoff and discharges that occur during heavy rainstorms. This phosphorus loading attributable to dairies in the North Bosque watershed, in turn, is the primary cause of the lake's heavy algal growth.

- In addition to contributing nutrients that lead to algal growth and, ultimately, to taste and odor problems in drinking water, CAFOs in the North Bosque watershed are also a source of bacteria and other pathogens entering Lake Waco. In addition to driving up water treatment costs, the presence of these pathogens in the lake endanger the health and enjoyment of the City's many citizens who swim, fish, sail, ski, and engage in other water recreation there.

- If the problems with the proposed O-Kee Dairy permit identified in the City's comments are not remedied to any greater extent than described in the executive director's response, the increases in the dairy's herd size from 690 to 999 will increase the amounts of phosphorus and bacteria transmitted from the dairy, its waste application fields, and third-party fields into the North Bosque and downstream to Lake Waco, where it will contribute to increased algal growth, more bacteria, and the problems that follow. Although Lake Waco is approximately eighty miles downstream from the O-Kee Dairy, the distance does not substantially reduce these adverse effects because the primary mechanism through which these pollutants are transported are heavy rains, which can deliver the pollutants downstream in as little as 3-5 days.

The executive director timely filed a response in opposition to the City's contested-case hearing request. *See id.* § 55.209(d), (e).[9] He did not dispute that the City, if an affected person, would have a legal right to a contested-case hearing and conceded that the City's request met the Commission's formal and procedural requirements governing hearing requests, *see id.* §§ 55.201, .211(c)(2)(B)-(D), including providing the requisite "brief, but specific, written statement" explaining the City's personal justiciable interest, *id.* § 55.201(d)(2). The executive director further concluded that the City had identified nine disputed and material fact issues or sets of issues that it

---

[9] Responses were also filed by the applicants, who opposed the hearing request, and the Commission's public interest counsel, who maintained that the City was an affected person and entitled to a contested-case hearing. Amicus letters in opposition to the hearing request were also submitted by the Texas Association of Dairymen and a state legislator who represented Hamilton County.

had timely raised in its comments, not withdrawn, and that would be referable to SOAH. *See id.* §§ 55.201(d)(4), .211(c)(2)(A). The executive director disputed only whether the City met the requirement of an "affected person" with regard to the O-Kee Dairy permit.

The executive director analyzed the City's request under the non-exclusive "factors" that the Commission "considers" under its rules to identify "affected persons." *See id.* § 55.203(c). He first observed that the City has no legal authority to regulate dairies outside its territorial jurisdiction or to enforce CAFO regulations in particular. *See id.* § 55.203(b) ("[g]overnmental entities . . . with authority under state law over issues raised by the application may be considered affected persons"), (c)(6) ("for governmental entities, their statutory authority over or interest in the issues relevant to the application"). On the other hand, observing that the City had water rights in Lake Waco, the executive director acknowledged that the City's "interest in maintaining water quality in Lake Waco is protected by the rules and regulations covering this permit application and there is also a reasonable relationship between the interest claimed and the activity regulated." *See id.* § 55.203(c)(1) ("whether the interest claimed is one protected by the law under which the application will be considered"), (3) ("whether a reasonable relationship exists between the interest claimed and the activity regulated"). "However," the executive director reasoned, "the distance from the dairy to the City of Waco and Lake Waco weigh heavily against Waco's claim that they are an affected person for purposes of this particular permit application." *See id.* §§ 55.203(4) ("likely impact of the regulated activity . . . on the use of property of the person"), (5) ("likely impact of the regulated activity on use of the impacted natural resource by the person"). In support of that conclusion, the executive director relied on two sets of basic propositions:

18

- The extent of any discharge from the dairy's RCSs that would be allowed by the permit, he suggested, would be rare or insignificant, occurring only "in the event of a rainfall event that exceeds the 25-year, 10-day storm event for this area." As for runoff from the dairy's waste-application fields and third-party fields, the executive director reasoned it is considered non-point source runoff and exempt agricultural runoff that was not regulated so long as waste was applied in compliance with the permit and applicable rules. Further elaborating on these issues, the executive director attached the draft permit, his responses to public comment, and a "fact sheet" detailing his position that the amended permit, despite authorizing hundreds more cows, would nonetheless be "more stringent" in terms of water-quality protections than the existing one.

- "Assuming the dairy had a discharge," the executive director added, it would be unlikely to impact Lake Waco because the dairy is approximately 7.2 downstream miles from reaching the North Bosque, then another 75 miles before the North Bosque reaches the point where it empties into the lake. "At 82 miles upstream," he reasoned, "the distance is such that . . . assimilation and dilution would occur long before the water reaches Lake Waco." "However, even if the discharge could somehow survive the 82 mile trip downstream," the executive director further reasoned, "it would then have to survive further dilution to travel an additional 6.8 miles across Lake Waco" to reach the City's municipal water intake point. The executive director did not cite to any support for these conclusions other than to attach a map illustrating the distances described.

The executive director also urged several broader policy or administrative justifications for denying the City's hearing request. He argued that the City's claim to affected-person status implied that "any city in Texas can challenge any permit upstream of their drinking water supply, without regard to distance, through the [contested-case hearing] process." He further suggested that the City's real issue "is not the potential contamination that could be caused by this particular dairy, but the cumulative effects of all dairy CAFO operations in the North Bosque watershed," going as far as to assert that "[n]one of the documentation submitted by [the City] identifies the Applicant by name as a source of nutrients." Similarly, urging that "many" of the City's complaints were in reality challenges to the underlying CAFO rules, the executive director

19

criticized the City for an "entirely inappropriate" use of a contested-case hearing on a single permit to vent concerns that are properly addressed through rule-making or statutory change.

The City filed a reply in support of its hearing request. *See id.* § 55.209(g). It specifically disputed, among other things, whether the proposed permit would ensure compliance with Commission rules, the TMDLs, or the federal Clean Water Act; the factual accuracy of the executive director's assertions regarding "assimilation" and "dilution" of pollutants; the director's policy views regarding cumulative impacts; and his attempt to characterize the City's arguments as implicating only the upstream dairy industry as a whole and not the O-Kee Dairy permit in particular. The City presented a supplemental affidavit from Wiland in which he elaborated on the bases for his opinions, citing a study of nutrient loading in Lake Waco by Dr. Kenneth Wagner, and further detailing his opinions regarding a causal linkage between specific claimed deficiencies in the proposed permit and water-quality problems in Lake Waco. In part, Wiland opined that the proposed permit allowed excessive application of waste to WAFs and did not address application to third-party fields at all, that the nutrients and pollutants would be washed off the fields in the watershed and into the North Bosque during wet weather, that the permit aggravated the problem by permitting waste application to saturated fields, and that the same wet conditions would speed transmission (and reduce any natural attenuation) of pollutants to Lake Waco.

The Commission subsequently considered the City's hearing request and the O-Kee Dairy permit application in a public meeting. *See id.* § 55.209(g). It is undisputed that no further evidence was presented on the hearing request. The Commission denied the City's hearing request without referring it to SOAH. *See id.* § 55.211(b). Its order elaborated only that it had evaluated the request "under the requirements of the applicable statutes and Commission rules, including 30 Texas

20

Administrative Code (TAC) Chapter 55," and considered the "responses to the hearing request filed by the Executive Director, the Office of Public Interest Counsel, the Applicant; the City of Waco's reply; and all timely public comment." In the same order, the Commission also proceeded to adopt the executive director's response to public comment, approved the permit amendment, and issued the permit as the executive director had proposed.

The City sought judicial review of the Commission's order. *See* Tex. Water Code Ann. §§ 5.351, .354 (West Supp. 2010).[10] During the pendency of the suit, the Commission supplemented the administrative record to include not only the filings in the O-Kee Dairy permitting proceeding, but additional agency documents, created prior to its order, reflecting its study and actions concerning broader water-quality issues in the North Bosque watershed and Lake Waco. These documents included the 2001 TMDLs for the North Bosque watershed, the 2002 implementation plan for the TMDLs, the Commission's responses to public comment concerning the TMDLs and implementation plan (including comments from the City), 2004 and 2008 status reports concerning implementation of the TMDLs, and 2002 water-quality assessments pertaining to Lake Waco and the North Bosque watershed.

The district court affirmed the Commission's order in full. This appeal ensued. *See id.* § 5.355 (West Supp. 2010).

---

[10] It appears that the City filed both a motion for rehearing before the Commission and a suit for judicial review, then filed a second suit for judicial review after its rehearing motion was overruled. The district court subsequently consolidated the two proceedings.

21

**ANALYSIS**

In a single issue, the City asserts that the Commission "erred" in denying its request for a contested-case hearing and that the district court similarly erred in affirming the Commission's order.

Although the Commission did not elaborate in its order on its specific grounds for denying the City's hearing request, nor did it enter findings of fact and conclusions of law, the parties agree that the order is founded on an ultimate legal conclusion that the City had failed to demonstrate that it is an "affected person" with respect to the O-Kee Dairy permit application under the meaning of the water code provisions and Commission rules that govern its right to a contested-case hearing. The Commission thus concedes that, as its executive director determined, the City's hearing request raised disputed, relevant, and material fact issues regarding the O-Kee Dairy permit application and otherwise complied with the procedural and substantive requirements that would entitle the City, if an "affected person," to a contested-case hearing on the application. *See id.* § 5.556(c), (d); 30 Tex. Admin. Code §§ 55.201, .211(b)(3), (c).

The City challenges this ultimate legal conclusion with essentially two sets of arguments. In the first, the City contends that the Commission's conclusion is predicated on an erroneous construction of "affected person" as defined under the water code and Commission rules. The City's second set of arguments concerns the factual bases on which the Commission would have impliedly relied in reaching that conclusion. We consider each in turn.

22

**"Affected person"**

Our resolution of the City's first set of arguments turns on statutory construction, which presents a question of law that we review de novo. *See State v. Shumake*, 199 S.W.3d 279, 284 (Tex. 2006). Our primary objective in statutory construction is to give effect to the Legislature's intent. *See id.* We seek that intent "first and foremost" in the statutory text. *Lexington Ins. Co. v. Strayhorn*, 209 S.W.3d 83, 85 (Tex. 2006). "Where text is clear, text is determinative of that intent." *Entergy Gulf States, Inc. v. Summers*, 282 S.W.3d 433, 437 (Tex. 2009) (op. on reh'g) (citing *Shumake*, 199 S.W.3d at 284). We consider the words in context, not in isolation. *See State v. Gonzalez*, 82 S.W.3d 322, 327 (Tex. 2002). We rely on the plain meaning of the text, unless a different meaning is supplied by legislative definition or is apparent from context, or unless such a construction leads to absurd results. *See Entergy Gulf States, Inc.*, 282 S.W.3d at 437; *City of Rockwall v. Hughes*, 246 S.W.3d 621, 625-26 (Tex. 2008); *see also* Tex. Gov't Code Ann. § 311.011 (West 2005) ("Words and phrases shall be read in context and construed according to the rules of grammar and common usage," but "[w]ords and phrases that have acquired a technical or particular meaning, whether by legislative definition or otherwise, shall be construed accordingly."). We also presume that the Legislature was aware of the background law and acted with reference to it. *See Acker v. Texas Water Comm'n*, 790 S.W.2d 299, 301 (Tex. 1990). We further presume that the Legislature selected statutory words, phrases, and expressions deliberately and purposefully. *See Texas Lottery Comm'n v. First State Bank of DeQueen*, 325 S.W.3d 628, 635 (Tex. 2010); *Shook v. Walden*, 304 S.W.3d 910, 917 (Tex. App.—Austin 2010, no pet.).

These principles have application even where, as here, the judgment or order on appeal is predicated on an administrative agency's construction of a statute that it is charged

23

with administering. *See Railroad Comm'n of Tex. v. Texas Citizens for a Safe Future & Clean Water*, 336 S.W.3d 619, 624-25 (Tex. 2011). The Commission emphasizes that there are circumstances in which courts must give deference—"serious consideration"—to an agency's construction of a statute it is charged with administering. *See id.*; *Fiess v. State Farm Lloyds*, 202 S.W.3d 744, 747-48 (Tex. 2006). However, as the Texas Supreme Court has recently made clear, this rule of deference applies only when the statute in question is ambiguous—i.e., susceptible to more than one reasonable interpretation—and only to the extent that the agency's interpretation is one of those reasonable interpretations. *See Texas Citizens for a Safe Future & Clean Water*, 336 S.W.3d at 624-25. Consequently, to determine whether this rule of deference applies, a reviewing court must first make a threshold determination that the statute is ambiguous and the agency's construction is reasonable—questions that turn on statutory construction and are reviewed de novo. *See id.* at 625. The "serious construction" rule is further limited and qualified by, among other things, the principle that courts give less deference to an agency's construction of a statute that does not lie within its administrative expertise or pertains to a non-technical issue of law. *See id.* at 630 (citing *Rylander v. Fisher Controls Int'l, Inc.*, 45 S.W.3d 291, 302 (Tex. App.—Austin 2001, no pet.)).

Similarly to the "serious consideration" rule where it applies, we defer to an agency's interpretation of its own rules unless that interpretation is plainly erroneous or inconsistent with the text of the rule or underlying statute. *See Public Util. Comm'n v. Gulf States Util. Co.*, 809 S.W.2d 201, 207 (Tex. 1991); *Tennessee Gas Pipeline Co. v. Rylander*, 80 S.W.3d 200, 203 (Tex. App.—Austin 2002, pet. denied). We construe administrative rules in the same manner as

statutes since they have the force and effect of statutes. *Rodriguez v. Service Lloyds Ins. Co.*, 997 S.W.2d 248, 254 (Tex. 1999).

As previously noted, the Commission rules that control the City's right to a contested-case hearing all incorporate a definition of "affected person" found in water code section 5.115. *See* 30 Tex. Admin. Code §§ 55.103, .203. Section 5.115, in turn, defines an "affected person" as one "who has a personal justiciable interest related to a legal right, duty, privilege, power, or economic interest" in the matter at issue, and not merely "[a]n interest common to members of the general public." Tex. Water Code Ann. § 5.115(a). The City argues that "affected person" as defined in water code section 5.115 must be construed in accordance with case decisions espousing an expansive view of standing to participate in administrative hearings. *See, e.g.*, *Fort Bend County v. Texas Parks & Wildlife Comm'n*, 818 S.W.2d 898, 899 (Tex. App.—Austin 1991, no writ) (observing that "[a]s a matter of policy, the right to participate in agency proceedings is liberally construed in order to allow the agency the benefit of diverse viewpoints"); *Texas Indus. Traffic League v. Railroad Comm'n of Tex.*, 628 S.W.2d 187, 197 (Tex. App.—Austin 1982) (reasoning that "[s]ince administrative proceedings are different from judicial proceedings in purpose, nature, procedural rules, evidence rules, relief available and the availability of review, . . . one's right to appear in an agency proceeding should be liberally recognized," and that "[a]ny stricture upon standing in an administrative agency would . . . be inconsistent with the proposition that the agency ought to entertain the advocacy of various interests and viewpoints in determining where the public interest lies and how it may be furthered"), *rev'd on other grounds*, 633 S.W.2d 821 (Tex. 1982).

The Commission responds that the Legislature intended section 5.115's "affected person" definition to do precisely the opposite. It observes that the definition of an "affected person"

25

or "person affected" as one having a "justiciable interest" not common with the "general public" tracks the jurisprudence addressing constitutional standing requirements in court, *see Hooks v. Texas Dep't of Water Res.*, 611 S.W.2d 417, 419 (Tex. 1981), which are more restrictive than the standing concepts generally applicable at the agency level, *see Texas Rivers Prot. Ass'n v. Texas Natural Res. Conservation Comm'n*, 910 S.W.2d 147, 151 (Tex. App.—Austin 1995, writ denied). Further, citing anecdotal legislative history, the Commission maintains that the Legislature intended section 5.115 to combat perceived overuse or misuse of contested-case hearings in Commission permitting proceedings. *See* Senate Comm. on Natural Resources, Bill Analysis, Tex. S.B. 1546, 74th Leg., R.S. (1995). Consequently, the Commission reasons, the judicial standing requirements that the Legislature incorporated into section 5.115 must be applied "narrowly" or "restrictively" in light of the legislative intent to limit access to contested-case hearings.

We agree with the Commission, but only in part.

As this Court has previously observed, a "personal justiciable interest" not common to members of the "general public"—the cornerstone of section 5.115's "affected person" definition—denotes the constitutionally minimal requirements for litigants to have standing to challenge governmental actions in court. *See HEAT*, 962 S.W.2d at 295 (observing that Commission's associational standing rules that incorporated section 5.115's "affected person" requirement were "clearly derived" from constitutional standing requirements articulated in *Texas Ass'n of Bus. v. Texas Air Control Bd.*, 852 S.W.2d 440, 446-47 (Tex. 1993)); *accord United Copper*, 17 S.W.3d at 803. As we recently summarized these constitutional standing requirements and their purposes:

26

The general test for constitutional standing in Texas courts is whether there is a "real" (i.e., justiciable) controversy between the parties that will actually be determined by the judicial declaration sought. *See* [*Texas Ass'n of Bus.*, 852 S.W.2d] at 446. Constitutional standing is thus concerned not only with whether a justiciable controversy exists, but whether the particular plaintiff has a sufficient personal stake in the controversy to assure the presence of an actual controversy that the judicial declaration sought would resolve. *See Patterson v. Planned Parenthood*, 971 S.W.2d 439, 442 (Tex. 1998); *Nootsie, Ltd. v. Williamson County Appraisal Dist.*, 925 S.W.2d 659, 662 (Tex. 1996). The requirement thereby serves to safeguard the separation of powers by ensuring that the judiciary does not encroach upon the executive branch by rendering advisory opinions, decisions on abstract questions of law that do not bind the parties. *See Texas Ass'n of Bus.*, 852 S.W.2d at 444.

For a party to have standing to challenge a governmental action, as a general rule, it "must demonstrate a particularized interest in a conflict distinct from that sustained by the public at large." *South Tex. Water Auth. v. Lomas*, 223 S.W.3d 304, 307 (Tex. 2007); *see Brown v. Todd*, 53 S.W.3d 297, 302 (Tex. 2001) ("Our decisions have always required a plaintiff to allege some injury distinct from that sustained by the public at large."); *Tri County Citizens Rights Org. v. Johnson*, 498 S.W.2d 227, 228-29 (Tex. Civ. App.—Austin 1973, writ ref'd n.r.e.) ("It is an established rule . . . that '. . . sufficiency of a plaintiff's interest (to maintain a lawsuit) comes into question when he intervenes in public affairs. When the plaintiff, as a private citizen, asserts a public, as distinguished from a private, right, and his complaint fails to show that the matters in dispute affect him differently from other citizens, he does not establish a justiciable interest.'") (quoting 1 Roy W. McDonald, *Texas Civil Practice* § 3.03, at 229 (rev. vol. 1965)).

*Stop the Ordinances Please v. City of New Braunfels*, 306 S.W.3d 919, 925-26 (Tex. App.—Austin 2010, no pet.) (footnote omitted) (*STOP*). By crafting a definition of "affected person" that precisely mirrors these standing principles and incorporating it into the statute governing contested-case hearing requests in water-quality permitting proceedings, the Legislature unambiguously manifested its intent that those same principles govern standing to obtain a contested-case hearing in those proceedings. *See Entergy Gulf States, Inc.*, 282 S.W.3d at 437 (where statutory terms have acquired a technical meaning, we apply that meaning); *Acker*, 790 S.W.2d at 301 (we presume the Legislature was aware of background law); *State v. Young*, 265 S.W.3d 697, 705-07 (Tex. App.—Austin 2008,

27

pet. denied) (applying similar analysis to determine that Legislature's use of the phrase "has been granted relief based on actual innocence" in wrongful-conviction statute denoted relief obtained through habeas corpus and not direct appeal).

To possess standing under these principles with regard to the O-Kee Dairy permit application, the City had to establish:

(1)    an "injury in fact" from the issuance of the permit as proposed—an invasion of a "legally protected interest" that is (a) "concrete and particularized" and (b) "actual or imminent, not conjectural or hypothetical";

(2)    the injury must be "fairly traceable" to the issuance of the permit as proposed, as opposed to the independent actions of third parties or other alternative causes unrelated to the permit; and

(3)    it must be likely, and not merely speculative, that the injury will be redressed by a favorable decision on its complaints regarding the proposed permit (i.e., refusing to grant the permit or imposing additional conditions).

*See Brown v. Todd*, 53 S.W.3d 297, 305 (Tex. 2001) (quoting *Raines v. Byrd*, 521 U.S. 811, 818-19 (1997), *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)); *STOP*, 306 S.W.3d at 926-27; *Save Our Springs Alliance, Inc. v. City of Dripping Springs*, 304 S.W.3d 871, 878 (Tex. App.—Austin 2010, pet. denied). Together, these elements serve to limit court intervention to disputes that the judiciary is constitutionally empowered to decide by "ensur[ing] that the plaintiff has a sufficient personal stake in the controversy so that the lawsuit would not yield a mere advisory opinion or draw the judiciary into generalized policy disputes that are the province of the other branches." *STOP*, 306 S.W.3d at 927 (citing *Lujan*, 504 U.S. at 569, 576-78; *Save Our Springs Alliance, Inc.*, 304 S.W.3d at 894). Consequently, as the Commission observes, the "personal justiciable interest" requirement is more restrictive than the standing concepts that ordinarily govern

the public's right to participate in executive agency proceedings. *See, e.g.*, *Texas Rivers Prot. Ass'n*, 910 S.W.2d at 151; *Fort Bend County*, 818 S.W.2d at 899.

The City also insists that to establish its "personal justiciable interest" in the O-Kee Dairy permit application, it need not prove the "merits" of its objections to the proposed permit, but only show that some "potential harm" would result if the permit was issued as proposed. The City is correct to the extent that the existence of the injury-in-fact required for constitutional standing is conceptually distinct from the ultimate question of whether the plaintiff has incurred a *legal* injury—i.e., whether the plaintiff has a valid claim for relief on the merits. *See STOP*, 306 S.W.3d at 926-27 (citing *Hunt v. Bass*, 664 S.W.2d 323, 324 (Tex. 1984)). This distinction is reflected in our precedents addressing contested-case hearing requests before the Commission. *See United Copper*, 17 S.W.3d at 802-04; *HEAT*, 962 S.W.2d at 295.

*United Copper* involved a 1997 application for an air-quality permit by United Copper Industries, Inc., to operate two copper-melting furnaces, facilities that would emit copper and lead particulate matter into the air. 17 S.W.3d at 799-800. After United Copper submitted its application with research data predicting levels of ground-level emission concentration that would result from the operation, the Commission determined that the proposed facility would not have any negative impact on the health or property interests of the public in the surrounding area—a finding required before the Commission could issue the permit under the then-applicable version of the health and safety code. *Id.* at 800 (citing Tex. Health & Safety Code Ann. § 382.0518(b) (West Supp. 2000)). Following public notice of the permit application, Grissom, who lived within two miles of the proposed facilities, sent a letter to the Commission requesting a contested-case hearing on the application. *Id.* at 800. In his letter, Grissom expressed concern that

29

the facilities would have adverse health effects on himself and his two sons, all of whom suffered from serious asthmatic conditions. *Id.*

United Copper filed a response urging that, with reference to the then-applicable, pre-1999 version of water code section 5.115 and Commission rules, the hearing request should be denied because (1) Grissom was not an "affected person," (2) the hearing request was "unreasonable," and (3) Grissom had failed to present "competent evidence" (or, for that matter, any evidence) in support of his request. *Id.* The Commission's executive director, on the other hand, filed a response conceding that Grissom was an "affected person" but urging that his hearing request should be denied as "unreasonable" in the view that United Copper's uncontroverted evidence "established that the emissions would probably not negatively affect Grissom, his family, nor any other members of the public." *Id.* Grissom did not file a reply in support of his hearing request, nor did he ever submit evidence. *See id.* At a subsequent public meeting, the Commission, concluding that Grissom had failed to meet the requirements for obtaining a contested-case hearing, denied his request and proceeded to grant United Copper's permit application. *Id.* at 800-01.

Grissom sued for judicial review, contending that, at a minimum, he was entitled to a "preliminary hearing" at which he would have an opportunity to present evidence in support of his request. *Id.* at 801. The district court agreed, deciding that the Commission erred in determining that the hearing request was unreasonable and not supported by competent evidence without first providing Grissom a preliminary hearing at which he could offer evidence, and remanding the proceeding to the Commission for that purpose. *Id.* at 801-02. Both United Copper and the Commission appealed.

Of immediate relevance, United Copper argued that the district court should have upheld the Commission's order because the research data it submitted with its permit application, which Grissom never controverted, conclusively established that Grissom's health, safety, and property would not be affected by its operations and, consequently, that he was not an "affected person." *See id.* at 802-03. This Court disagreed that United Copper's evidence negated any effect of the proposed operation on Grissom or his family, observing that the data actually "indicates that the operations will result in increased levels of lead and copper at the site of Grissom's home and the elementary school one of his sons attends." *Id.* at 803-04. Consequently, we reasoned, the data "does not prove that Grissom and his family will not be affected" so as to have a personal justiciable interest in the permit, but only "merely suggests that Grissom may not be affected to a *sufficient degree* to entitle him to prevail in a contested-case hearing on the merits of his case against United Copper's application." *Id.* at 803 (emphasis in original). In this regard, "United Copper," this Court explained, "confuses the preliminary question of whether an individual has standing as an affected person to *request* a contested-case hearing with the ultimate question of whether that person will *prevail* in a contested-case hearing on the merits." *Id.* (emphasis in original) (citing *HEAT*, 962 S.W.2d at 295). Relying on United Copper's own proof regarding the effect of its proposed operations and the factual allegations in Grissom's hearing request regarding his close proximity to the facility and "unique health concerns," the Court held that Grissom and his family had a personal justiciable interest in United Copper's permit application because they faced "potential harm" from the permitted activity. *Id.* at 803-04.

*HEAT*, on which *United Copper* relied in part, involved the application by an operator of a hazardous waste storage and processing company to renew the Commission permit under

31

which it conducted its business. *See HEAT*, 962 S.W.2d at 289. Invoking a statutory right of "persons affected"—as defined by the pre-1999 version of water code section 5.115—to a contested-case hearing on the application, a coalition of residents who lived near HEAT's facility requested a hearing based on the affected-person status of individual members. *Id.* The Commission exercised its discretion to refer the issue of the coalition's standing (including the "affected person" status of individual members) to SOAH. *See id.* SOAH conducted an evidentiary hearing and heard testimony that included the account of a coalition member who claimed that he lived one-and-a-half blocks from the HEAT facility, that he had detected odor coming from the facility that was especially strong in the afternoons, and that it had affected his breathing and caused throat problems that prompted him to seek medical attention. *Id.* at 289-90, 295. HEAT attempted to challenge this testimony by identifying inconsistences between the location of the member's house and the direction from which he claimed the odors came, and also suggested that the odors might have come from other area businesses who used chemicals. *See id.* at 295. However, HEAT apparently acknowledged during the hearing that it was planning to reduce its odor emissions in connection with a separate Commission proceeding. *See id.*

With reference to the pre-1999 version of water code section 5.115, the administrative law judge (ALJ) found that the testifying coalition member had "presented competent evidence, in the form of his personal testimony, that odors from the HEAT facility are negatively affecting him and his use of his property." *Id.* at 294. The ALJ concluded that the member was a "person affected" by the permit and that, in turn, the coalition had associational standing to obtain a contested-case hearing. *Id.* The Commission, however, deleted the ALJ's findings and substituted its own findings negating the testifying member's individual standing and, thus, the coalition's

32

associational standing. *Id*. The Commission found that the member had not established that HEAT had caused the odors he had experienced, that the facility would likely impact the health, safety, or use of his property, or that there was a reasonable relationship between his interest and the regulated activity. *Id.* Reviewing the Commission's substituted findings under a substantial-evidence analysis, this Court held that "the Commission could not reasonably have determined the Coalition did not have standing." *Id.* at 295.

While acknowledging inconsistencies in the member's testimony regarding the directions from which the odors came and evidence regarding other odor-emitting businesses in the area, the Court emphasized HEAT's admissions that it was planning to reduce odor emissions at its facility. *Id*. "This evidence," the Court urged, "suggests the HEAT facility had the *potential* to emit odors, and it lends credence to [the member's] assertion that he smelled odors coming from the HEAT facility." *Id.* (emphasis in original). This Court further reasoned that the constitutional standing requirements incorporated into water code section 5.115 "do[] not require parties to show they will ultimately prevail in their lawsuits; it requires them only to show that they will potentially suffer harm or have a 'justiciable interest' related to the proceedings." *Id.* The Commission's substituted findings, the Court added, "suggest that the Coalition would have had to prove the merits of its case against HEAT just to have *standing* to prove them again in a hearing on the merits." *Id.* (emphasis in original).

The City places great emphasis on *United Copper* and *HEAT*'s use of the phrase "potential harm" to describe the nature of the actual or anticipated injury necessary to give rise to a personal justiciable interest. The City reasons that allegations or proof of *some* or *any* "potential" for harm, however remote, are sufficient. To the contrary, the required "potential harm" to the

33

City from the permit's issuance "must be more than speculative. There must be some allegation or evidence that would tend to show that the [City's legally protected interests] will be affected by the action." *See Save Our Springs Alliance, Inc*, 304 S.W.3d at 883.[11] Both *United Copper* and *HEAT* are ultimately consistent with this requirement. In *United Copper*, the "potential harm" that conferred standing was established by United Copper's own data indicating that its operations would increase levels of lead and copper particulate at Grissom's home and his child's school, together with proof that Grissom and his child suffered from "serious asthma." *See* 17 S.W.3d at 803-04. In *HEAT*, the "potential harm" was established where the association member's house was located one-and-a-half blocks from the facility, the permit applicant had acknowledged in another Commission proceeding that the facility indeed emitted odors, and the association member claimed to detect strong odors coming from it. *See* 962 S.W.2d at 295; *accord Texas Rivers Prot. Ass'n*, 910 S.W.2d at 151 ("potential harm" to riparian property owners and canoe guides from lowering river levels was sufficient to confer standing).

Finally, we note that while questions of subject-matter jurisdiction, including standing, are conceptually distinct from the merits, as the City suggests, more recent decisions of the Texas Supreme Court and this Court have made clear that the two issues can nonetheless overlap or parallel each other in some instances. *See Texas Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d

---

[11] *See also Texas Disposal Sys. Landfill, Inc. v. Texas Comm'n on Envtl. Quality*, 259 S.W.3d 361, 363-64 (Tex. App.—Amarillo 2008, no pet.) (holding that party lacked standing to complain of Commission's decision to modify permit because alleged potential injury was "mere speculation"; likening alleged chance of injury to that of "pig growing wings").

217, 226-29 (Tex. 2004); *Hendee v. Dewhurst*, 228 S.W.3d 354, 366-69, 373-79 (Tex. App.—Austin 2007, pet. denied).[12]

The City also suggests that, as a matter of statutory construction, its personal justiciable interest in the O-Kee Dairy permit application was established through the Legislature's 2001 enactment of the MSSIZ legislation. Through this enactment, as previously noted, the Legislature, at the City's urging, imposed new environmental restrictions on dairy CAFOs located in a MSSIZ, a term that was defined so as to include at the time only the North Bosque watershed above Lake Waco. The City further observes that the legislation's new environmental restrictions included mandating individual rather than general permits for new or expanded CAFOs located in a MSSIZ, *see* Tex. Water Code Ann. § 26.503(a), which had the effect of removing an exemption from the requirement of an opportunity for a contested-case hearing. *See* 30 Tex. Admin. Code § 55.201(i)(7). The City urges that the Commission and this Court are bound to defer to this "legislative intent" to protect water quality in Lake Waco from the CAFOs' possible pollution, including allowing it to obtain a contested-case hearing on its objections to the proposed O-Kee Dairy permit. To hold that the City is not an "affected person" here, the City further reasons, would "effectively dismiss the [MSSIZ] legislation and language and intent and render it a nullity."

We disagree that anything in the MSSIZ legislation establishes the City's "personal justiciable interest" in the O-Kee Dairy permit application or that it is otherwise entitled to a contested-case hearing. As previously explained, we determine the Legislature's intent "first and foremost" from the objective meaning of the words the Legislature has actually enacted. *See*

_____

[12] However, as we observe below, such overlap has important implications for the procedures through which the jurisdictional issue may be decided.

35

*Lexington Ins. Co*, 209 S.W.3d at 85; *Shumake*, 199 S.W.3d at 284. Under the MSSIZ legislation, it is true, as the City observes, that the Legislature required individual permitting of dairy CAFOs within MSSIZs, that this measure has the effect of generally expanding access to contested-case hearings concerning those facilities' permit applications, and that the O-Kee Dairy is within the legislation's coverage. However, nothing in the MSSIZ legislation addresses contested-case hearings in particular permitting proceedings, much less creates a right to one. *See generally* Tex. Water Code Ann. §§ 26.501-.504. The Legislature instead left those issues to be governed by subchapter M and the Commission's related rules—which, again, incorporate water code section 5.115's requirement of a "personal justiciable interest," the constitutionally minimal requirement of standing to challenge governmental action in court. *See id.* § 5.115; 30 Tex. Admin. Code §§ 55.201, .203. Nor does anything in the MSSIZ legislation purport to address, much less alter, these standing requirements. *See generally* Tex. Water Code Ann. §§ 26.501-.504.

At most, the City's observations concerning the MSSIZ legislation indicate that the Legislature made policy determinations that Lake Waco (and, by extension, the City) warranted various forms of additional protections against perceived pollution threats from upstream dairies. But if so, this would prove no more than that the City possessed a stake in the ongoing *policy* debate regarding dairy CAFOs in the North Bosque watershed. A "personal justiciable interest," as the Legislature has required before the City can obtain a contested-case hearing, entails more. The purpose of the "personal justiciable interest" requirement, again, is to distinguish the types of controversies that the *judiciary* is constitutionally empowered to decide from the broader policy disputes that are the domain of the Legislature or executive agencies. *See STOP*, 306 S.W.3d at 927

36

(citing *Lujan*, 504 U.S. at 560, 576-78). Lacking any indication in the statutory text that the Legislature intended to confer such an interest on the City with respect to particular permitting proceedings, we conclude that the MSSIZ legislation does not impact our analysis of whether the City possesses a personal justiciable interest with regard to the O-Kee Dairy permit.

On the other hand, we must also reject, as similarly lacking textual support in the statute, the Commission's view that the Legislature intended the personal justiciable interest requirement under subchapter M to be applied particularly "narrowly" or "restrictively," with an eye to limiting access to contested-case hearings. To support that proposition, the Commission relies primarily on anecdotal legislative history preceding the original enactment of water code section 5.115, which occurred in 1995. *See* Senate Comm. on Natural Resources, Bill Analysis, Tex. S.B. 1546, 74th Leg., R.S. (1995). The Commission emphasizes that proponents advocated the addition of section 5.115 as one of several measures—along with authorizing general permits and exempting "minor" permit amendments from hearing requirements—aimed at limiting the use of contested-case hearings in Commission permitting matters and their attendant cost and delay. *See id.* Leaving aside that intervening amendments suggest a more complicated and nuanced legislative disposition toward access to contested-case hearings in Commission permitting proceedings,[13] it is the intent that the Legislature has objectively expressed in the words it actually enacted that governs

---

[13] *E.g.*, the 1999 amendments deleting the "reasonableness" and "competent evidence" requirements from section 5.115 and the 2001 enactment of the MSSIZ legislation, which, while not directly creating a right to a contested-case hearing for particular permit proceedings, did expand the range of proceedings in which such hearings potentially may be available. *See* Act of May 30, 1999, 76th Leg., R.S., ch. 1350, § 1, 1999 Tex. Gen. Laws 4570 (codified at Tex. Water Code Ann. § 5.115) (West Supp. 2010); Act of May 28, 2001, 77th Leg., R.S., ch. 965, § 12, 2001 Tex. Gen. Laws 4570 (amending Tex. Water Code Ann. § 26.001(10), (13) (West 2008), adding Tex. Water Code Ann. §§ 26.501-.504) (West 2008).

our construction of the personal justiciable interest requirement. *See Entergy Gulf States, Inc.*, 282 S.W.3d at 437. Here, the Legislature has manifested its intent that access to contested-case hearings under subchapter M be governed by the same requirement of a personal justiciable interest that controls standing to seek judicial relief against governmental action. *See* Tex. Water Code Ann. § 5.115(a). It is the substance of that requirement, not the Commission's perceptions about subjectively preferred outcomes, that controls whether it operates "narrowly" or "broadly" as to any particular hearing request. *See Iliff v. Iliff*, No. 09-0753, 2011 WL 1446725, at *3 (Tex. Apr. 15, 2011) ("In construing a statute, the court's purpose is to give effect to the Legislature's *expressed* intent.") (emphasis added).

The Commission also claims broad discretion to "weigh" or "balance" the "factors" identified in its rule, *see* 30 Tex. Admin. Code § 55.203(c), as well as broader concerns of policy and administration—such as its general charge to consider "the economic development of the state" when regulating water quality, *see* Tex. Water Code Ann. § 26.003, or any preference it might have for addressing a particular complaint (e.g., cumulative impacts of dairy CAFOs) via rule-making rather than adjudication—in determining whether a hearing requestor is (or should be) considered an "affected person" entitled to a contested-case hearing. In support, the Commission cites the rule-making delegation in water code section 5.115, where the Legislature charged the Commission with "adopt[ing] rules specifying factors which must be considered in determining whether a person is an affected person," *id*. § 5.115(a), as well as the "factors" rule itself, *see* 30 Tex. Admin. Code § 55.203(c). However, under the explicit text of both provisions, it remains that an "affected person" is ultimately defined as one having a "personal justiciable interest" in a permit application—and that definition necessarily constrains whatever discretion the Commission possesses to "consider"

38

"factors" in "determining" whether that definition is met in regard to a given hearing request. *See* Tex. Water Code Ann. § 5.115(a) (defining "affected person" in terms of "personal justiciable interest" and then charging Commission with "adopt[ing] rules specifying *factors* which must be *considered in determining whether* a person is an affected person"); 30 Tex. Admin. Code § 55.203(a) (defining "affected person" in regard to hearing request as one having a "personal justiciable interest"), (c) ("*[i]n determining whether* a person is an affected person, all *factors* shall be *considered*, including, but not limited to, the following . . .") (emphases added). The "factors," in other words, are not made inquiries unto themselves, and do not purport to narrow or redefine the ultimate benchmark of personal justiciable interest that defines an affected person, but are mere "factors" the Commission "considers" in "determining" whether that benchmark is met. *See* Tex. Water Code Ann. § 5.115(a); 30 Tex. Admin. Code § 55.203(a), (c). Consequently, while each of the factors may potentially be relevant to determining whether the required personal justiciable interest is present, the legal significance of a given factor in regard to a particular hearing request must turn on the extent to which the factor informs that ultimate inquiry under the specific circumstances of the case. *See City of El Paso v. Public Util. Comm'n*, 883 S.W.2d 179, 184 (Tex. 1994) (agency action is arbitrary and capricious if, among other things, agency failed to consider factor Legislature directs it to consider or considered irrelevant factor).

Having thus construed "affected person" and "personal justiciable interest," we turn to the City's arguments regarding the factual bases underlying the Commission's conclusion that the City failed to meet these requirements.

39

**Underlying facts**

The City argues that "undisputed" facts it presented in its written hearing request and incorporated evidence establish its affected-person status as a matter of law. At least with respect to the threshold requirement of a legally protected interest, we agree with the City.

### *Legally protected interest*

The City claims a legally protected interest predicated on, among other things, its property or economic stake in Lake Waco's water quality. The City alleged and presented evidence—and it remains undisputed—that it owns all adjudicated and permitted rights to the water impounded in Lake Waco, uses the water as the sole supply source for its municipal water utility, and must treat the water to ensure that it is safe for uses that include drinking and bathing and that it will be regarded as palatable by the customers to whom the City sells the water, including major industrial customers "that place a premium on the quality of the water they use." The City further asserted and presented evidence—again, without dispute—that it is incurring escalating costs to combat unpleasant taste and odor in the water that it sells to its customers.

These undisputed facts establish, as a matter of law, the type of interest, rooted in property rights, that constitute legally protected interests, distinct from those of the general public. *See STOP*, 306 S.W.3d at 928 (businesses that rented coolers had standing to challenge ordinance that banned coolers inasmuch as ordinance restricted their use of property and caused them to incur additional expenses to purchase replacement coolers that complied with ordinance); *Lake Medina Conservation Soc'y v. Texas Natural Res. Conservation Comm'n*, 980 S.W.2d 511, 516 (Tex. App.—Austin 1998, pet. denied) (association comprised of lakeside property owners and

waterfront businesses had standing to challenge administrative action that would cause lake levels to drop); *Texas Rivers Prot. Ass'n*, 910 S.W.2d at 151-52 (riparian property owners and canoe guides had standing to challenge agency action that would lower river levels). Indeed, in his response to the City's hearing request, the Commission's own executive director conceded that the City's "interest in maintaining water quality in Lake Waco is protected by the rules and regulations covering this permit application and there is also a reasonable relationship between the interest claimed and the activity regulated." *See* 30 Tex. Admin. Code § 55.203(c)(1) (factors to determine "affected person" include "whether the interest claimed is one protected by the law under which the application will be considered"), (3) ("whether a reasonable relationship exists between the interest claimed and the activity regulated").

On appeal, the Commission urges that the City has no legal authority to regulate the O-Kee Dairy and therefore could not be an "affected person" by virtue of having "authority under state law over issues raised by the application," one of the considerations identified in its "factors" rule. *See id.* § 55.203(b) ("[g]overnmental entities . . . with authority under state law over issues raised by the application may be considered affected persons"), (c)(6) (factors include, "for governmental entities, their statutory authority over or interest in the issues relevant to the application"); *see City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 673, 680 (Tex. 1979). However, the City does not rely on a claim to such authority as the basis for its asserted legally protected interest. As for any other claim the City makes to a legally protected interest, the Commission accuses the City of merely asserting the individual interests of its citizens, customers, or other members of the public in ensuring Lake Waco's water quality. It is true that, in its hearing request, the City purported to act not only in its own behalf, but also as *parens patriae* for its

41

citizens. To the extent that the City seeks merely to stand in its citizens' shoes in asserting their common interests in ensuring Lake Waco's water quality, we agree that those interests would, by definition, be common to members of the general public. *See Save Our Springs Alliance, Inc.*, 304 S.W.3d at 878-80 (concluding that plaintiffs who claimed "environmental," "scientific," and "recreational" interests in public water body, but no property interests affected by alleged pollution of it, had not established injury distinct from that of general public). But again, the City also asserts its own property or economic interests that sufficiently distinguish it from the general public.

Regarding the City's property or economic interest in Lake Waco's water quality, the Commission suggests that because the City may externalize its increased water treatment costs to some extent through higher taxes on its citizens or higher water rates for its customers, its interest in Lake Waco is ultimately no different from that of the general public. The sole authority the Commission cites in support of that proposition is a case addressing the individual standing of a Fort Worth resident to challenge that city's expansion of its zoo into public parkland. *Persons v. City of Fort Worth*, 790 S.W.2d 865 (Tex. App.—Fort Worth 1990, no writ). In *Persons*, the court of appeals held that the resident lacked standing because, while he claimed to have used and enjoyed the parkland in various ways, he failed to identify a personal justiciable interest in using the parkland that distinguished him from any other citizen of the city. *Id.* at 869-71. *Persons* does not speak to a municipality's claim of standing and, if it has any relevance here, it is only to highlight the distinctions between interests common to the "general public" and the type of legally protected interest the City possesses in Lake Waco water. Furthermore, the Commission's view would imply that a municipality that supplies water could never have a justiciable interest distinct from its customers, as virtually any water-quality or supply problem could, in theory, be resolved through

42

higher expenditures passed on through higher taxes and rates. We reject that notion. *See City of San Antonio v. Texas Water Comm'n*, 407 S.W.2d 752, 764-65 (Tex. 1966) (municipality had justiciable interest in permit proceeding impacting reservoir that served as source for municipal water utility).

In sum, based on the undisputed facts relating to the City's property or economic interest in Lake Waco's water quality, we conclude that, as a matter of law, the City possesses the requisite legally protected interest that may give rise to a personal justiciable interest in the O-Kee Dairy permit application.

### *Concrete and imminent injury, causation, and redressibility*

To have a personal justiciable interest in the O-Kee Dairy permit application, the City must also have injury to its legally protected interest in Lake Waco's water quality that (1) is (a) "concrete and particularized" and (b) "actual or imminent, not conjectural or hypothetical"; (2) is "fairly traceable" to the issuance of the permit as proposed (as opposed to the independent actions of third parties or other alternative causes unrelated to the permit); and that (3) it would be likely, and not merely speculative, that the injury would be redressed by a favorable decision on its complaints regarding the proposed permit—i.e., refusing to grant the permit or imposing additional conditions. *See Brown*, 53 S.W.3d at 305 (quoting *Raines*, 521 U.S. at 818-19 (1997); *Lujan*, 504 U.S. at 560-61); *STOP*, 306 S.W.3d at 926-27; *Save Our Springs Alliance, Inc.*, 304 S.W.3d at 878. In contrast to its arguments regarding the City's legally protected interest, the Commission has not asserted that the factual allegations in the City's hearing request or its evidence, *if taken as true*, would be legally insufficient to establish these remaining elements of a personal justiciable

interest. Instead, the Commission has purported to rely on contrary factual determinations, based on its weighing of "evidence," to the effect that:

- the amended O-Kee Dairy permit would not increase but reduce the risk and amount of phosphorus or pathogens being contributed by the dairy to the North Bosque River;

- any phosphorus or pollutants the dairy did contribute would be "assimilated" or "diluted" as they washed downstream so as to have no ultimate impact on Lake Waco;

- assuming any phosphorus from the dairy actually reached Lake Waco, whether it would contribute to algal growth would be, at best, speculative because (a) myriad other sources also contribute phosphorus to Lake Waco (e.g., other dairies, municipal water treatment plants), (b) other nutrients also contribute to algal growth (e.g., nitrogen from row-crop farms along the other rivers that flow into Lake Waco), and (c) many factors other than nutrients, such as sunlight and climate, influence algal growth;

- in any event, there is no connection between algal growth and episodes of taste and odor problems in Lake Waco drinking water, which predate the growth of the dairy industry in the North Bosque watershed; and

- bacteria is not an issue in Lake Waco, which meets regulatory standards for contact recreation, and is not among the water bodies deemed "impaired" by bacteria. Nor has North Bosque segment 1226—the segment immediately north of Lake Waco that includes the O-Kee Dairy—been deemed impaired by bacteria since 2002.[14]

The Commission reasons that these findings, alone or in combination, would negate the existence of the requisite "concrete and particularized," imminent injury "fairly traceable" to the issuance of the O-Kee Dairy permit and likely redressed by denying the permit or imposing additional conditions. *See Brown*, 53 S.W.3d at 305 (quoting *Raines*, 521 U.S. at 818-19; *Lujan*, 504 U.S. at 560-61).

---

[14] The Commission couches its analysis of these facts and "evidence" in terms of its rule "factors" in its rule relating to a "reasonable relationship . . . between the interest claimed and the activity regulated," the "likely impact of the regulated activity on the . . . use of property of the person," and the "likely impact of the regulated activity on use of the impacted natural resource by the person." *See* 30 Tex. Admin. Code § 55.203(c)(3)-(5) (West 2011).

*Evidence*?

The Commission's focus on "evidence," not to mention the City's own reliance on affidavits, beg threshold questions regarding whether the Commission has any discretion under the current water code and Commission rules to look beyond the written hearing request, response, and reply, and consider evidence relevant to the requestor's personal justiciable interest. As previously noted, while prior versions of the water code and rules required hearing requestors to supply "competent evidence" in support of their applications, that requirement was eliminated from the water code in 1999, *see* Act of May 30, 1999, 76th Leg., R.S., ch. 1350, § 1, 1999 Tex. Gen. Laws 4570, and the current versions of the water code and rules contain no express reference to evidence, nor to any procedure contemplating evidence, other than with respect to hearing requests that the Commission opts to refer to SOAH. *See* Tex. Water Code Ann. §§ 5.115, .556; Tex. Admin. Code §§ 55.201, .209, .211. On the other hand, the current water code does not expressly prohibit consideration of evidence, either. The Legislature simply directs the Commission to "determine[]," as a threshold matter, whether a "request was filed by an affected person as defined by Section 5.115"—i.e., one having a personal justiciable interest in the permit application, *see* Tex. Water Code Ann. § 5.115(a)—and does not elaborate as to how the Commission is to make this determination. *See id.* § 5.556(c).

The Commission's rules are more specific as to the procedures, however, and they impose what are in the nature of pleading requirements—the hearing requestor must file a written hearing request that "identif[ies] the person's personal justiciable interest affected by the application," including "a brief, but specific, written statement explaining in plain language the requestor's location and distance relative to the proposed facility or activity that is the subject

45

of the application and how and why the requestor believes he or she will be adversely affected by the proposed facility or activity in a manner not common to members of the general public," followed by opportunities to file a "response" and "reply." *See* 30 Tex. Admin. Code §§ 55.201(c)-(d), .209(c)-(e). But then again, nothing in the rules explicitly limits the Commission's inquiry solely to the factual allegations in the hearing request or otherwise prohibits presentation or consideration of evidence. *See id.*

In asserting that it may weigh evidence and reject the City's factual allegations or evidence, the Commission analogizes itself to a trial court deciding a plea to the jurisdiction. It is now well-established that trial courts, when determining jurisdictional issues, including standing, are not bound by pleading allegations but may—and, indeed, must—consider evidence to the extent necessary to decide the issue. *See, e.g.*, *Miranda*, 133 S.W.3d at 226-29; *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 554-55 (Tex. 2000). This is so despite the fact that the Texas Rules of Civil Procedure do not mention such a procedure. We also note that in at least one other procedural context analogous to the present one—the education commissioner's determination of his own jurisdiction over appeals under section 7.057 of the education code, which also does not mention evidence[15]—we have previously approved the agency's adoption of the basic analytical framework applied by trial courts when deciding pleas to the jurisdiction, including consideration of jurisdictional evidence in addition to the pleadings. *See Tijerina v. Alanis*, 80 S.W.3d 292, 295 (Tex. App.—Austin 2002, pet. denied); *Smith v. Nelson*, 53 S.W.3d 792, 794 (Tex. App.—Austin 2001, pet. denied) (citing *Bland*, 34 S.W.2d at 555). Finally, we observe that, within statutory and constitutional constraints, administrative agencies possess "considerable procedural flexibility" in

---

[15] *See* Tex. Educ. Code Ann. § 7.057 (West 2006).

46

the manner in which they discharge their delegated functions. *See City of Corpus Christi v. Public Util. Comm'n of Tex.*, 51 S.W.3d 231, 262 (Tex. 2001).

Informed by these precedents, and barring any express prohibition to that effect in the water code or rules, we cannot conclude that the Commission would categorically lack discretion to consider evidence—through some sort of procedure—when it "determines" whether a "request was filed by an affected person as defined by Section 5.115." *See* Tex. Water Code Ann. § 5.556(c). But this conclusion leads us to tougher questions concerning the specific procedures through which the Commission may consider evidence and how we review its factual determinations.

*Substantial evidence?*

The parties vigorously join issue as to the validity of the implied fact findings on which the Commission relies and, as a preliminary matter, the standard (or standards) that govern our review of any such findings.[16] The gravamen of the Commission's position is that we must affirm its order because substantial evidence in the existing agency record supports the implied findings. As the Commission emphasizes, the substantial-evidence test or standard of review is essentially a rational-basis test whereby courts determine, as a matter of law, whether an agency's order finds reasonable factual support in the record. *See Texas Health Facilities Comm'n v. Charter*

---

[16] In addition to the parties' briefing on original submission and the City's motion for reconsideration en banc, we have considered briefing submitted on these important issues by three amici on motion for reconsideration en banc: (1) the Texas Chapter of the Coastal Conservation Association (CCA), which describes itself as "a non-profit marine conservation organization" that "regularly comments upon and requests contested case hearings on applications filed at the [Commission] that seek authority to discharge wastewater into or adjacent to the Texas Coast"; (2) Mont Belvieu Caverns, L.L.C., which complains of what it perceives as the Commission's overly broad application of substantial-evidence review in a current proceeding regarding the entity's eligibility for a tax exemption; and (3) Professor Ron Beal of the Baylor Law School.

47

*Med.—Dallas, Inc.*, 665 S.W.2d 446, 452-53 (Tex. 1984). Under this test, we consider whether the evidence as a whole is such that reasonable minds could have reached the same conclusion as the agency in the disputed action. *Collins*, 94 S.W.3d at 881 (citing *Stratton v. Austin Indep. Sch. Dist.*, 8 S.W.3d 26, 30 (Tex. App.—Austin 1999, no pet.)). The issue is not whether the agency reached the correct conclusion, but rather whether there is some reasonable basis in the record for its action. *City of El Paso*, 883 S.W.2d at 185. We may not substitute our judgment for that of the agency on matters committed to its discretion. *Stratton*, 8 S.W.3d at 30. Importantly, the agency's findings, inferences, conclusions, and decisions are presumed to be supported by substantial evidence, and the burden is on the contestant to prove otherwise. *Collins*, 94 S.W.3d at 881.

The City disputes that the substantial-evidence test or standard of review is relevant or applicable to our disposition of this appeal. In essence, it urges that there can be no substantial-*evidence* review where, as here, there was no evidentiary hearing at the agency level. The City observes that "substantial-evidence" review, at least as it is known under the APA, applies only to contested-case proceedings, thus presupposing an agency record that has been developed through trial-like adjudicative procedures, including the opportunities to test evidence through cross-examination and contrary evidence. *See* Tex. Gov't Code Ann. §§ 2001.171-.1775 (West 2008) (prescribing procedures for judicial review of "a final decision in a contested case," including review of the agency record to determine whether decision is "not reasonably supported by substantial evidence considering the reliable and probative evidence in the record as a whole"); *see generally id.* §§ 2001.051-.103 (prescribing agency-level procedures for hearing a "contested case"). No such adjudicative procedure was afforded it here, as the City observes, because the Commission's rules explicitly provide that the agency's "consideration" of its hearing request "is not itself a contested

48

case subject to the APA." *See* 30 Tex. Admin. Code § 55.211(a)(4). The City further asserts that it was arbitrary and capricious, if not a denial of "due process," for the Commission to resolve factual and evidentiary issues without affording it the opportunity to test and rebut any evidence on which the Commission relies through an adjudicative hearing. It relies primarily on *United Copper*, in which this Court, in addition to holding that the evidence did not conclusively establish that the hearing requestor was not an affected person, affirmed the district court judgment ordering a limited contested-case hearing on whether the requestor was an affected person entitled to a contested-case hearing on the merits of the proposed permit. *See* 17 S.W.3d at 804-06. Citing what it regarded as the confusing nature of Commission rules and notices and other circumstances, this Court reasoned that "fundamental ideals of fairness," and "[b]asic due process" required that the requestor be given a "meaningful opportunity" to develop evidence to demonstrate his entitlement to a hearing and that the Commission had acted "unreasonably" in denying him a contested-case hearing for that purpose. *See id.* Although *United Copper* involved the application of the pre-1999 version of water code section 5.115—which, unlike the current version, required the requestor to present "competent evidence" and establish the "reasonableness" of the request—the City suggests that *United Copper* is nonetheless controlling to the extent that the Commission is purporting to rely on evidence.

We begin by considering whether the substantial-evidence analysis governs our review of the Commission's implied factual determinations. The parties agree that the APA's provisions governing judicial review of contested cases—including the "substantial-evidence" review on the agency record provided under that statute—are not directly applicable here because

49

there was no "contested case" before the Commission.[17]  *See* Tex. Gov't Code Ann. §§ 2001.171-.1775.  That factor distinguishes this case from *HEAT*, in which the Commission had exercised its discretion to refer the hearing request to SOAH for a limited contested-case hearing, such that judicial review was governed by the APA.  *See* 962 S.W.2d at 289, 294-95.  The parties also seem to recognize that the statute authorizing judicial review of the Commission's order, section 5.351 of the water code, does not specify a standard or scope of review.  In relevant part, section 5.351 provides only that a person who is "affected by a ruling, order, decision, or other act of the commission may file a petition to review, set aside, modify, or suspend the act of the commission." Tex. Water Code Ann. § 5.351(a).  These features of section 5.351 serve to distinguish this case from *United Copper*, in which we held that textual similarities between the APA and the statute authorizing judicial review there reflected legislative intent to adopt the APA's provisions governing the standard and scope of review of contested cases.  *See United Copper*, 17 S.W.3d at 801.  We relied on statutory language directing the reviewing court to consider only "whether the [Commission's] action is invalid, arbitrary, or unreasonable," a phrase that this Court had previously held "was intended to incorporate the entire scope of review" under the APA.  *Id.* (citing *Smith v. Houston Chem. Servs., Inc.*, 872 S.W.2d 252, 257 n.2 (Tex. App.—Austin 1994, writ denied)).

---

[17]  Amicus curiae CCA maintains that we should resolve this case by holding that the Commission's proceeding falls within the APA's definition of a "contested case" (notwithstanding the Commission's rule to the contrary) and that, for this reason, the APA independently requires "contested-case" hearing procedures.  The CCA urges us to revisit this Court's precedents holding that the APA does not independently create a right to such a hearing in a "contested case." *See, e.g.*, *Texas Dep't of Ins. v. State Farm Lloyds*, 260 S.W.3d 233, 244 (Tex. App.—Austin 2008, no pet.) (observing that "[t]his Court has long held that, absent express statutory authority, the APA does not independently provide a right to a contested case hearing," and citing several of our precedents). Especially where neither party is making such an argument here, we decline the invitation.

In the absence of statutory guidance, the Commission invokes jurisprudence predating both the APA and its statutory predecessor, the 1975 Administrative Procedure and Texas Register Act (APTRA),[18] that applied a common-law version of the "substantial evidence rule" in suits for judicial review under section 5.351's predecessors. *See City of San Antonio*, 407 S.W.2d at 756, 758-62; *Southern Canal Co. v. State Bd. of Water Eng'rs*, 318 S.W.2d 619, 622-24 (Tex. 1958). From these pre-APTRA decisions, the Commission deduces a categorical rule that we must review all of its decisions for substantial evidence on the agency record and affirm if we find substantial evidence. The Commission's view is founded upon misperceptions about the origins, nature, and purposes of the "substantial-evidence rule" that is reflected in these decisions.

To explain why, we begin with the principle that an administrative agency's order made within its discretionary statutory and constitutional authority is ordinarily shielded by sovereign immunity from suit, such that there is no right to judicial review, unless and until the Legislature has waived that immunity by conferring a right of judicial review. *See Texas Dep't of Protective & Regulatory Servs. v. Mega Child Care, Inc.*, 145 S.W.3d 170, 198 (Tex. 2004); *Creedmoor-Maha Water Supply Corp. v. Texas Comm'n on Envtl. Quality*, 307 S.W.3d 505, 514 (Tex. App.—Austin 2010, no pet.); *cf. Creedmoor-Maha*, 307 S.W.3d at 526 (contrasting "inherent" judicial power to restrain agency actions violative of statutory or constitutional provisions, which is not barred by sovereign immunity). However, even while the Legislature generally has the prerogative to waive sovereign immunity to permit judicial review, Texas courts have long held separation-of-powers principles bar the judiciary—even where the Legislature has purported to grant

---

[18] *See* Act of April 8, 1975, 64th Leg., R.S., ch. 61, §§ 1-24, 1975 Tex. Gen. Laws 136, 136-48, *repealed and replaced by* Act of May 4, 1993, 73rd Leg., R.S., ch. 268, §§ 1-50, 1993 Tex. Gen. Laws 583, 583-987.

such broad review powers—from redetermining the fact findings of agencies exercising their administrative functions. *See Gerst v. Nixon*, 411 S.W.2d 350, 353-54 (Tex. 1966); *Southern Canal Co.*, 318 S.W.2d at 622-24. Instead, "[t]he judicial inquiry in regard to such matters is restricted to the *method* employed by the administrative agency in arriving at its decision . . . . [That is,] whether the decision of the administrator is fraudulent, capricious or arbitrary." *Gerst*, 411 S.W.2d at 354 (emphasis added) (footnote omitted) (citing *Davis v. City of Lubbock*, 326 S.W.2d 699, 714-15 (Tex. 1959); *Chemical Bank & Trust Co. v. Falkner*, 369 S.W.2d 427, 431-33 (Tex. 1963)). Conversely, it is also long established that an agency order failing to pass muster under this inquiry must be set aside as invalid, as "arbitrary action of an administrative agency cannot stand." *Lewis v. Metropolitan Sav. & Loan Assoc.*, 550 S.W.2d 11, 16 (Tex. 1977) (citing *Gerst*, 411 S.W.2d at 354). This inquiry, in concept, presents a question of law rather than fact, going to the reasonableness of the agency's order rather than whether a preponderance of evidence supports the order. *See City of San Antonio*, 407 S.W.2d at 756.

An "arbitrary" agency decision includes one that is made "without regard to the facts." *See Gerst*, 411 S.W.2d at 354 (quoting *Railroad Comm'n of Tex. v. Shell Oil Co.*, 161 S.W.2d 1022, 1029 (Tex. 1942)). The substantial-evidence test evolved in Texas jurisprudence as an evidentiary mechanism through which a party could seek to establish the arbitrariness and invalidity of an agency order and thereby overcome the order's presumption of regularity. *See id.* ("The so-called substantial evidence rule may be more accurately described as a test rather than a rule. When properly attacked, an arbitrary action cannot stand and the test generally applied by the courts in determining the issue of arbitrariness is whether or not the administrative order is reasonably supported by substantial evidence."). In this respect, lack of substantial evidence

52

and agency arbitrariness have been considered "two sides of the same coin." *See Charter Med.*, 665 S.W.2d at 454. However, establishing lack of substantial evidence is by no means the *only* method by which an agency's decision can be shown to be arbitrary and invalid. *See id*.; *Lewis*, 550 S.W.2d at 15-16.

In its original, common-law form, Texas's "substantial-evidence review" entailed a bench trial at which the contestant was provided the opportunity to establish—through the presentation and rebuttal of evidence, cross-examination, and other normal evidentiary and procedural features of civil actions generally—that no reasonable factual basis for the order had existed at the time the order was made. *See Gerst*, 411 S.W.2d at 354; *Shell Oil Co.*, 161 S.W.2d at 1030; *see also* Thomas M. Reavley, *Substantial Evidence and Insubstantial Review in Texas*, 23 Sw. L.J. 239, 241 (1969). Whether or not the *agency* had actually heard or relied on any such facts as the basis for its order was not considered material given that the parties would have "full opportunity in their appearance before a judicial body 'to show that at the time the order was entered there did, or did not, then exist sufficient facts to justify entry of the same.'" *Gerst*, 411 S.W.2d at 354 (quoting *Cook Drilling Co. v. Gulf Oil Corp.*, 161 S.W.2d 1035, 1036 (Tex. 1942)). In fact, the agency record was not generally admissible. *See Shell Oil Co.*, 161 S.W.2d at 1030; Reavley, 23 Sw. L.J. at 241 n.14. This procedural regime was said to be justified in light of the "informal" nature of agency proceedings and as a preferable alternative to placing the burden on agencies "to make an 'appeal-proof' record in every instance." *Cook Drilling Co.*, 161 S.W.2d at 1036.

This method of substantial-evidence review—what we now commonly term "substantial-evidence-de-novo" review, to distinguish it from the APA's "pure" substantial-evidence review on the agency record—was the dominant or "default" method of judicial review in

53

Texas state courts prior to the 1975 enactment of APTRA. *See Gerst*, 411 S.W.2d at 354-55 ("This rule of procedure has application to judicial review when the statute allowing such review expressly so provides; or the statute, while allowing judicial review, is silent as to the method or when in the absence of express statutory provision, a judicial review is allowed because of constitutional considerations."); *see also Gilder v. Meno*, 926 S.W.2d 357, 366 (Tex. App.—Austin 1996, writ denied) (Jones, J., dissenting) ("Whatever its flaws, substantial evidence de novo was the prevailing method of judicial review in this state from the 1930s until the enactment of the [APTRA] in 1975."). And this was the form of substantial-evidence review that the Texas Supreme Court was applying in the pre-APTRA precedents on which the Commission relies. *See City of San Antonio*, 407 S.W.2d at 756, 758; *Southern Canal Co.*, 318 S.W.2d at 623-24.

In agency proceedings within their scope, the APTRA and APA have supplanted the substantial-evidence-de-novo method in favor of a substantial-evidence analysis generally confined to the record made before the agency. *See* Tex. Gov't Code Ann. §§ 2001.174(2)(E), .175(e). But just as with the substantial-evidence-de-novo procedure, APA "pure," on-the-agency-record substantial-evidence review contemplates that the contestant is afforded an opportunity to elucidate the factual bases of the agency's order through presentation and rebuttal of evidence, cross-examination, and other trial-type procedures—a contested-case hearing. *See id.* §§ 2001.171, .174. Indeed, with substantial-evidence review confined to the agency record, the full and fair opportunity to develop an evidentiary record in this manner "becomes of paramount importance." *Lewis*, 550 S.W.2d at 13. And, absent this opportunity to develop the agency record, as this Court has recently observed, "no substantial evidence review is required or even possible." *Texas Dep't of Ins. v. State Farm Lloyds*, 260 S.W.3d 233, 245 (Tex. App.—Austin 2008, no pet.). This Court has

54

similarly reasoned that where the Legislature has specified substantial-evidence review of an agency decision under the APA, it necessarily intended that the contestant be afforded an adjudicative hearing before the agency to develop the evidentiary record. *See Ramirez v. Texas State Bd. of Med. Exam'rs*, 927 S.W.2d 770, 773 (Tex. App.—Austin 1996, no writ) (rejecting argument that Legislature created right of judicial review of agency proceedings under APA substantial-evidence rule while depriving parties of opportunity for contested-case hearing; "[i]f the Board's interpretation were correct, it could deny applications . . . without creating any significant agency record at all, certainly not a record that would permit meaningful judicial review . . . [and] then the [L]egislature would have done a useless, futile thing in . . . provid[ing] for such review").

We recognize that this Court has not always spoken with complete clarity regarding whether substantial-evidence analysis can properly be applied to an agency record that has not been developed through contested-case or other trial-like processes. The Commission emphasizes *Collins*, which was a suit for judicial review under water code section 5.351 from a Commission order denying a hearing request under the pre-1999 version of water code section 5.115. This Court applied a substantial-evidence analysis confined to an agency record that consisted of both (1) the record from a limited contested-case hearing adjudicating a hearing requestor's proximity to the permitted activity (specifically, the accuracy of a scaled map that the permit applicant had presented), *and* (2) written submissions of evidence that the parties had filed with the Commission, including affidavits and reports from experts. *See Collins*, 94 S.W.3d at 881-83. Although judicial review of the contested-case hearing record would clearly be governed by the APA (as was the case in *HEAT*, 962 S.W.2d 288), the other evidence had not been subjected to contested-case processes. The Commission views *Collins* as supporting the application of substantial-evidence review to this sort

55

of informal agency record. However, the *Collins* opinion indicates that the contestant conceded or assumed that review of both components of the agency record was governed by the substantial-evidence standard. *See id.* at 879. In the least, there is no indication that the applicable standard of review was disputed.

The Commission emphasizes other cases in which this Court has used language referring to "substantial-evidence" review where the agency record was compiled without a contested-case or adjudicative hearing. *See County of Reeves v. Texas Comm'n on Envtl. Quality*, 266 S.W.3d 516, 527-28 (Tex. App.—Austin 2008, no pet.); *H.G. Sledge, Inc. v. Prospective Invest. Trading Co., Ltd.*, 36 S.W.3d 597, 602-03 (Tex. App.—Austin 2000, pet. denied); *Stratton*, 8 S.W.3d at 30; *Gilder*, 926 S.W.2d at 360-61.[19] In some of these cases, the applicability of substantial-evidence review appears to be conceded by the contestant, as in *Collins*. *See Stratton*, 8 S.W.3d at 29. In others, "substantial-evidence" review is used as a shorthand reference to the entire scope of review under the APA—which, while titled "Review Under Substantial Evidence Rule or Undefined Scope of Review," authorizes reversal of agency decisions not only where "not reasonably supported by substantial evidence considering the reliable and probative evidence in the record as a whole," but also if the decisions were "in violation of a constitutional or statutory provision," "in excess of the agency's statutory authority," "made through unlawful procedure," "affected by other error of law," or "arbitrary or capricious or characterized by abuse of discretion

---

[19] The Commission also cites *United Copper*, but that decision actually applied concepts of agency arbitrariness or unreasonableness that were independent from the question of whether substantial evidence supported the agency order. *See* 17 S.W.3d 797, 800-03 (Tex. App.—Austin 2000, pet. dism'd).

or clearly unwarranted exercise of discretion," *see* Tex. Gov't Code Ann. § 2001.174[20]—and is arguably dicta, as the cases were ultimately decided on substantive grounds other than the absence of substantial evidence. *See County of Reeves*, 266 S.W.3d at 526-31 (citing APA's entire scope of review; analysis turned on construction of rule); *H.G. Sledge, Inc.*, 36 S.W.3d at 602-07 (same).[21] In the final case, *Gilder*, which involved an administrative appeal of a school board's order to the education commissioner, the sole issue was whether a legislative requirement of "substantial-evidence" review contemplated review on a hearing record developed at the local level or a substantial-evidence-de-novo type proceeding before the Commissioner. *See* 926 S.W.2d at 359-64.

Regardless, even assuming that any of these cases were not fully distinguishable such that a conflict exists in our precedents, we would conclude that the correct rule—the one consistent with the origins and purposes of substantial-evidence review as it has evolved in Texas—is the one we recognize in *State Farm Lloyds*: substantial-evidence review on an agency record is simply "not possible" absent the opportunity to develop that record through a contested-case or adjudicative hearing. *See State Farm Lloyds*, 260 S.W.3d at 245; *see also Ramirez*, 927 S.W.2d at 773. The United States Supreme Court has reached a similar conclusion with respect to substantial-evidence review under federal law. *See Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 414-15 (1971) (substantial-evidence review applied to agency actions "based on a public adjudicatory

---

[20] As amicus Professor Beal suggests, such use of "substantial-evidence review" in both a broad and narrow sense, though confusing and perhaps incorrect, is not uncommon. *See, e.g.*, *State Farm Lloyds*, 260 S.W.3d at 241-42, 245-46 (using the term in both senses). As should be apparent from context, our use of "substantial-evidence" review above is intended in the narrower sense.

[21] *Collins* may also fall into this category, inasmuch as the decisive facts that negated the hearing applicant's affected-person status appear to have been uncontroverted. *See infra* at p. 60-64, 68-69.

hearing," not a "nonadjudicatory, quasi-legislative" agency proceeding that "is not designed to produce a record that is to be the basis of agency action—the basic requirement for substantial-evidence review").

In this case, the Commission, though recognizing that the underlying agency proceeding was not an APA-contested case, advocated that the district court confine its review to the agency record, and the district court complied. Consequently, because the City never had the opportunity to develop an evidentiary record before the Commission through contested-case or adjudicative processes, we agree with the City that substantial-evidence review is inapplicable and unavailable. *See State Farm Lloyds*, 260 S.W.3d at 245; *Ramirez*, 927 S.W.2d at 773; *see also Volpe*, 401 U.S. at 414-15.

As the City further suggests, such a deprivation of the opportunity to develop a record that could overcome the substantial-evidence standard may, in some circumstances, rise to the level of being a violation of procedural due process and, for that reason, arbitrary. *See United Copper*, 17 S.W.3d at 804-06; *see also Lewis*, 550 S.W.2d at 13-16. We need not decide if that is so here because the agency record, even in its current state, reveals that the Commission, as a matter of law, acted arbitrarily with respect to its asserted implied fact findings—independently and apart from whether substantial evidence could be said to support those findings. *See Charter Med.*, 665 S.W.2d at 454; *Lewis*, 550 S.W.2d at 13-16; *State Farm Lloyds*, 260 S.W.3d at 245-46.[22]

---

[22] Similarly, we express no opinion as to whether the reasoning under this Court's precedents extending APA-style review on the agency record to agency proceedings other than contested cases is applicable to this case. *See Gilder v. Meno*, 926 S.W.2d 357, 359-64 (Tex. App.—Austin 1996, writ denied) (reasoning that education code provision requiring reversal of decision if "arbitrary, capricious, unlawful, or not supported by substantial evidence" contemplated substantial-evidence review confined to agency record because, in Court's view, language was modeled on previously enacted APTRA judicial-review provisions); *see also id.* at 367 (Jones, J., dissenting) ("Regarding

58

*Arbitrariness*

An administrative agency is said to act arbitrarily or capriciously where, among other things, it fails to consider a factor the Legislature has directed it to consider, considers an irrelevant factor, or considered relevant factors but still reaches a completely unreasonable result. *See City of El Paso*, 883 S.W.2d at 184. An agency also acts arbitrarily in making a decision "without regard to the facts," *see Gerst*, 411 S.W.2d at 354 (quoting *Shell Oil Co.*, 161 S.W.2d at 1029), relying on fact findings that are not supported by any evidence, *see Flores v. Employees Ret. Sys. of Tex.*, 74 S.W.3d 532, 542 (Tex. App.—Austin 2002, pet. denied), or if otherwise there does not "appear a rational connection between the facts and the decision." *Starr County v. Starr Indus. Servs., Inc.*, 584 S.W.2d 352, 356 (Tex. Civ. App.—Austin 1979, writ ref'd n.r.e.) (citing *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 285 (1974)). In short, "the reviewing court must remand [for arbitrariness] 'if it concludes that the agency has not actually taken a hard look at the salient problems and has not genuinely engaged in reasoned decision-making.'" *Id.* (quoting *Texas Med. Ass'n v. Matthews*, 408 F. Supp. 303, 205 (W.D. Tex. 1976)). The record demonstrates the absence of the required "hard look" and "reasoned decision-making" by the Commission as to whether the City possesses the requisite "concrete and particularized," imminent injury fairly traceable to the issuance of the O-Kee Dairy permit that would likely be redressed by denying the permit or imposing additional conditions.

---

judicial review of administrative decisions to which the APA does not apply, Texas courts have consistently held that the proper approach is to revert to the pre-APA substantial-evidence-de-novo review.").

<u>Relative "protectiveness" of the amended permit</u>

Citing the proposed O-Kee Dairy permit's terms and its executive director's unsworn argument and analysis in response to the City's hearing request, the Commission asserts that this "evidence" establishes that the amended permit would reduce the amount and frequency of the O-Kee Dairy's contributions of pollutants to the North Bosque, even considering the addition of hundreds more cows to the facility. Because the new permit would thus be "more protective" of the North Bosque's water quality than the current one, the Commission reasons, the City cannot show any concrete or imminent adverse effect or injury to it if the permit were approved. In support of this reasoning, the Commission relies heavily on *Collins*.

In *Collins*, the operator of a poultry CAFO, B&N, applied for a permit amendment allowing it to change from a "dry" waste-management system to a "wet" waste-management system that utilized clay-lined waste-collection lagoons that were designed not to discharge waste. 94 S.W.3d at 879 n.3. The operator of an organic farm, Collins, filed a written request for a contested-case hearing, "claiming that his land was adjacent to B&N's property and that his groundwater resources and air quality, already adversely affected by B&N's operations, would further deteriorate if the permit were granted." *Id.* at 879. At the time, as we previously noted, hearing requests were governed by the pre-1999 version of water code section 5.115 and Commission rules that required a requestor not only to establish his personal justiciable interest, but also that his request was "reasonable" and supported by "competent evidence." *See id.* at 881-82. B&N filed a response challenging Collins's assertions that he would be affected by the proposed operations and specifically disputing Collins's claim that his property was adjacent to B&N's

property. *Id.* at 880. In support, B&N submitted a map indicating that its property, in fact, was not adjacent to Collins's but was located on the opposite side of an intervening property. *Id.*

B&N later filed a reply to responses filed by the Commission's executive director and the Office of Public Interest Counsel (who had initially sided with Collins) alleging that (1) Collins's home was at least 1.3 miles away from the nearest permanent odor source at the proposed operation, (2) neither Collins nor anyone else had previously complained about the existing operations, (3) the wind blew toward Collins's property only about four percent of the time, (4) area groundwater would be protected by the clay-lined lagoons, and (5) general groundwater flow was not in the direction of Collins's property. *See id.* B&N also challenged the reasonableness of Collins's request on the basis that the proposed "wet" waste-management system was environmentally superior to the current "dry" one. *Id.* In support, B&N attached a map with scales indicating that Collins's property was 590 feet away from B&N's farm and that his residence was approximately 1.3 miles away from Collins's residence; a wind data chart; and an affidavit of a professional engineer opining that, based on studies and data regarding groundwater in the area, the proposed waste lagoons would "likely not result in degradation of [Collins's] groundwater resources." *See id.* at 880, 881 n.5.

Subsequently, B&N filed aerial photos showing the distance between B&N's operations and Collins's property, as well as the affidavit of another professional engineer stating that the proposed "wet" waste-management system would be superior to the current one. *Id.* at 880. Collins countered with "photographs allegedly taken from [his] land of the existing poultry operations and some new construction; affidavits of other nearby landowners stating that they have experienced odors and insects coming from B&N's operation; and a letter from an engineer that questioned the wisdom of using compacted clay liners because such liners are difficult to install

61

correctly and are not as 'state of the art' as geomembrane liners" and "opin[ing] that insects and odors would be better controlled if the lagoons were covered." *Id.* at 880-81.

Collins's hearing request was considered by the Commission during a subsequent public meeting. *Id*. at 881. After Collins disputed the accuracy of the second map that B&N had submitted, the Commission referred the issue of the map's accuracy to SOAH for a limited contested-case hearing. *Id.* Following the hearing, the ALJ issued proposed findings of fact and conclusions of law indicating that the B&N map was accurate. *Id.* The Commission adopted the ALJ's proposed findings and conclusions and denied Collins's hearing request, clearing the way for the permit's approval. *Id.*

After the district court affirmed the Commission's denial of his hearing request, Collins appealed to this Court. *See id.* Applying a substantial-evidence standard of review that, again, no party appeared to dispute, this Court held that "the Commission was well within its discretion to determine that Collins is not an affected person," and did not reach whether the Commission could have denied the request for lack of reasonableness or "competent evidence." *See id.* at 881-83. It reasoned as follows:

> The map that the ALJ found to be accurate indicates that Collins's property is not adjacent to B&N's property and that his home is approximately 1.3 miles away from the proposed lagoons. Collins predicts that the lagoons will produce "noxious odors." But a concentrated animal feeding operation, such as B&N's farm, qualifies for a standard air permit—issued without the opportunity for a contested case hearing—if its permanent odor sources are at least half a mile from occupied residences and business structures.

> Collins also predicts that his groundwater will be polluted and submitted an affidavit of an engineer stating that clay liner systems are difficult to install and might fail. But the permit only authorizes a correctly installed lagoon system. The type of failure that Collins fears would actually be a permit violation. Moreover, the Commissioners had before them competent evidence that the

62

environment—including Collins's land, health, and safety—would be positively impacted by changing from the existing dry waste management to the clay lined lagoon system. By the time the Commission issued its order denying Collins's hearing request, it had considered the detailed affidavits of two engineers, indicating that the proposed clay lined lagoon system is environmentally superior to a dry waste system and that, in any event, Collins's groundwater resources were very unlikely to be affected even by the failure of the lagoon system.

*Id.* at 883 (citation omitted).

Citing this Court's language regarding the relative benefits of the proposed "wet" versus "dry" waste systems, the Commission portrays *Collins* to mean that if a proposed permit amendment can be said to improve environmental protections compared to the current permit, a hearing requestor cannot be affected or injured by its issuance so as to have a personal justiciable interest in opposing it. The City responds that the Commission misreads *Collins*, confuses the determination of its standing with the merits of its objections to the proposed permit, and improperly decided the merits. We agree with the City.

The salient holdings of *Collins* with respect to affected-person status are that (1) B&N's proposed operations were a sufficient distance from residential and business structures to exempt its air-protection aspects altogether from contested-case hearing requirements; and (2) with respect to groundwater, Collins could not be injured or affected by the permit as proposed because "substantial evidence" (again, conceded to be the applicable standard of review in the case) reasonably supported findings that (a) if B&N complied with the waste permit, the clay-lined ponds would prevent discharges into groundwater; and (b) even if the ponds failed, Collins was effectively "upstream" from B&N and still would not be affected by any discharge. *See id.* In fact, while this Court couched its analysis in terms of "substantial evidence," it does not appear from the opinion that Collins presented *any* evidence to controvert B&N's evidence of these facts. *See id.* at 879-81.

63

In other words, (1) even if Collins could be deemed an affected person with respect to air protections, he would have no legal right to a contested-case hearing; and (2) regarding groundwater, assuming B&N complied with the permit, there was undisputed evidence that *no* waste could emit from the ponds and get into Collins's groundwater, such that Collins would be affected by the permit's issuance. The facts are starkly different in the present case.

Here, in contrast to the air-quality issues in *Collins*, it is undisputed that the O-Kee Dairy CAFO permit application is subject to subchapter M's requirement of an opportunity for contested-case hearing. And, unlike the water-quality protections imposed in *Collins*, the proposed O-Kee Dairy permit, as the City emphasizes, explicitly contemplates that waste will discharge from the dairy's RCSs during periods of significant rainfall and, perhaps more critically, that waste will run-off from its WAFs and load nutrients into the North Bosque. Assuming the discharge, run-off, or loading contemplated by the permit would harm Lake Waco's water quality and the City's legally protected interest in it, the City would have a personal justiciable interest in ensuring that the permitted activities comply with current legal requirements. *See United Copper*, 17 S.W.3d at 802-04; *HEAT*, 962 S.W.2d at 295. That the current legal requirements incorporated into the new permit are "more protective" than in years past is, standing alone, irrelevant. What matters is that discharge, run-off, or loading is an acknowledged certainty under the amended permit, and if this injures the City's legally protected interest, the City would possess a personal justiciable interest in the enforcement of the current laws regardless of how the harm compares to that occurring under the previous permit. In this respect, this case is controlled by *HEAT* and *United Copper*, in which we held that it is the existence of *some* impact from a permitted activity, and not necessarily the *extent* or *amount* of impact, that is relevant to standing. *See United Copper*, 17 S.W.3d at 802-04; *HEAT*,

962 S.W.2d at 295; *see also STOP*, 306 S.W.3d at 926-27 (distinguishing between legal injury and the injury in fact required for standing). Consequently, to the extent that the Commission denied the City's hearing request based on the premise that the amended O-Kee Dairy permit would be "more protective" of the environment than the current one, it acted arbitrarily by relying on a factor that is irrelevant to the City's standing to obtain a hearing. *See City of El Paso*, 883 S.W.2d at 184 (agency action is arbitrary and capricious if agency considered an irrelevant factor); *State Farm Lloyds*, 260 S.W.3d at 246 (reversing agency order as arbitrary and capricious where "order was based in part on at least one legally irrelevant factor").

In the alternative, assuming that the extent or amount of the dairy's contributions of waste, nutrients, or pathogens to the North Bosque under the amended permit could be considered relevant to whether such contributions ultimately have *an* impact on Lake Waco and the City (as opposed to the *extent* or *amount* of such impact), we conclude there is an additional reason that the Commission would have abused its discretion in denying the City's hearing request based on an implied determination of those issues. This reason stems from the fact that the Commission could determine the extent or amount of the dairy's waste discharge, run-off, or loadings as they impact the City only by deciding some of the same fact disputes on which the City, if an affected person, would be entitled to a contested-case hearing on the merits of the proposed permit.

The Commission, as previously explained, has conceded that the City's hearing request raised disputed, relevant, and material fact issues regarding the O-Kee Dairy permit application on which the City, if an affected person, would be entitled to a contested-case hearing. *See* Tex. Water Code Ann. § 5.556(c)-(d); 30 Tex. Admin. Code §§ 55.201, .211(b)(3), (c). Among the nine sets of disputed material fact issues identified by the executive director as appropriate

65

for SOAH referral were those concerning the factual accuracy of calculations and underlying assumptions regarding the propensity of the dairy's RCSs to overflow and the amount of phosphorus loading that the WAFs would cause, questions relevant to whether the proposed permit complied with current regulatory requirements. In short, if the Commission is correct that the extent or amount of waste emissions or nutrient loading under the amended permit would properly be relevant to the City's standing to obtain a contested-case hearing, those issues would overlap with disputed fact issues on the merits of the permit application.

The City urges that the Commission cannot decide facts going to the merits of its objections to the O-Kee Dairy permit application in the course of determining its standing to obtain a contested-case hearing on the merits. In response, the Commission analogizes itself to a trial court deciding a plea to the jurisdiction, emphasizing that trial courts must consider evidence and determine facts relevant to subject-matter jurisdiction, *see, e.g.*, *Miranda*, 133 S.W.3d at 226-29; *Bland*, 34 S.W.3d at 554-55, and that, as a general rule, trial courts can decide evidence-based jurisdictional challenges on affidavits and written submissions rather than live evidence at a hearing. *See Miranda*, 133 S.W.3d at 227-29 (observing that trial courts possess broad discretion in first instance with respect to form in which evidence is presented and whether evidence-based jurisdictional challenges should be decided at a preliminary stage or await further development). It is also true that, contrary to what the City seems to suggest, disputed facts relevant to jurisdiction may overlap with the merits. *See id.* at 226-29; *Hendee*, 228 S.W.3d at 366-69. However, the Texas Supreme Court concluded in *Miranda* that where disputed jurisdictional facts overlap with the merits of claims or defenses, the otherwise broad procedural discretion of trial courts in deciding evidence-based jurisdictional challenges is sharply limited. In such instances, trial courts lack

66

discretion to dismiss a claim at a preliminary stage unless there is conclusive or undisputed evidence negating the challenged jurisdictional fact, similar to the standard governing a traditional summary-judgment motion. *See Miranda*, 133 S.W.3d at 227-28; *cf. University of Tex. v. Poindexter*, 306 S.W.3d 798, 806-07 (Tex. App.—Austin 2009, no pet.) (contrasting permissible procedures where there is overlap between jurisdictional issues and merits versus where there is not).

As previously suggested, we need not decide in this case whether, as a general matter, the Commission's procedural discretion in considering evidence relevant to hearing requests is as broad as that of trial courts deciding evidence-based jurisdictional challenges. However, guided by *Miranda*, we conclude that whatever discretion the Commission does possess would be limited, in a manner similar to trial courts, in instances where it determines disputed facts that are relevant to both a hearing requestor's standing and the merits of a permit application.

Underlying the analysis in *Miranda* is a claimant's right to have disputed facts material to the merits of claims and defenses determined at trial. *See Miranda*, 133 S.W.3d at 228 ("By reserving for the fact finder the resolution of disputed jurisdictional facts that implicate the merits of the claim or defense, we preserve the parties' right to present the merits of their case at trial."). That right exists unless there is no genuine issue of material fact and the merits can be determined as a matter of law. *See id.*; *see also Halsell v. Dehoyos*, 810 S.W.2d 371, 372 (Tex. 1991) (holding that refusal to grant jury trial is harmless error if record shows that no material issues of fact exist). A claimant's right to a determination of material, disputed facts at trial presumes, of course, that the claimant has properly invoked the trial court's subject-matter jurisdiction. In *Miranda*, the supreme court chose between two procedural alternatives for resolving genuine issues of material fact that are relevant to both jurisdiction and the merits: (1) resolve

67

them as part of a jurisdictional determination at a preliminary stage, with the potential effect of pretermitting an issue on the merits that otherwise would have required resolution through trial; or (2) defer the jurisdictional determination until trial and resolve the disputed fact at that time. *Miranda*, 133 S.W.3d at 227-28. The supreme court required the latter, and held that the former was an abuse of the trial court's discretion. *Id.*

The water code and Commission rules create an entitlement to a contested-case hearing that is analogous to a civil claimant's right to have disputed material fact issues determined at trial—an affected person is entitled to a contested-case hearing on disputed questions of fact raised during the public-comment period that are relevant and material to the Commission's decision on a permit application. *See* Tex. Water Code Ann. § 5.556; 30 Tex. Admin. Code §§ 55.201, .211(b)(3), (c)(2); *see also id*. § 26.028(c) (Commission must hold "public hearing" on request of affected person). Where "affected person" status turns on the same disputed facts, we conclude that *Miranda*'s reasoning would preclude the Commission from determining those facts without affording the hearing requestor the adjudicative processes that the Legislature and Commission rules have guaranteed them on the merits—a contested-case hearing.

The City, as previously noted, presented evidence that discharge or run-off of waste under the amended permit would have adverse effects on Lake Waco's water quality and the City's legally protected interest in it. Consequently, whatever "evidence" the Commission presented regarding the accuracy of the calculations and assumptions underlying its view of the amended permit's effects would not be uncontroverted or conclusive, as required under *Miranda*. The Commission, therefore, would have abused its discretion in deciding those issues without affording the City a contested-case hearing on those issues. *See Miranda*, 133 S.W.3d at 227-28. And,

68

although the Commission heavily relies on *Collins* in claiming broader discretion, that decision is ultimately consistent with the *Miranda* analysis—B&N presented uncontroverted evidence that negated any effect of the permit on Collins's groundwater. *See* 94 S.W.3d at 879-81.

In a final argument concerning the relative "protectiveness" of the amended permit, the Commission emphasizes that the Legislature has excluded from public-hearing requirements water-quality permit applications that do not seek either to "increase significantly the quantity of waste authorized to be discharged" or "change materially the pattern or place of discharge," if "the activities to be authorized . . . will maintain or improve the quality of waste authorized to be discharged." *See* Tex. Water Code Ann. § 26.028(d). Because the Legislature has thus impliedly authorized it to determine whether proposed permits would "increase . . .waste" or "change . . . the pattern or place of discharge" in order to ascertain whether contested-case hearing requirements apply at all, the Commission reasons that it may similarly consider a permit's likely effects in determining whether a hearing requestor is an affected person. However, the two sets of issues are distinct—one goes to whether a permit application is a type for which the Commission must afford an *opportunity* for a contested-case hearing if any affected persons want one, the other goes to whether a particular person has standing to *request* a contested-case hearing where the law requires an opportunity for such a hearing. In this case, the Commission has conceded that the O-Kee Dairy permit application seeks a "major amendment" and is therefore not excluded from the requirement that the Commission afford an opportunity for a contested-case hearing if any affected person requests one. Consequently, whatever discretion the Commission possesses in making this sort of

determination[23] has no bearing on its discretion in determining whether a hearing requestor is an affected person.

### Effects downstream

Because the Commission would have acted arbitrarily or abused its discretion in denying the City's hearing request based on implied findings regarding the anticipated relative protectiveness of the amended O-Kee Dairy permit, the Commission's order must ultimately rest upon its implied findings that any contributions of waste or nutrients by the O-Kee Dairy to the North Bosque watershed will ultimately have no effect on the City's legally protected interest in Lake Waco's water quality. The Commission first points to "evidence" that any waste or nutrients entering the watershed from the dairy would "assimilate" or "dilute" before they could harm Lake Waco or the City. As "evidence" of these facts, the Commission relies chiefly upon arguments in its executive director's response to the City's hearing request. As previously summarized, the executive director emphasized that the dairy was located approximately eighty miles upstream from Lake Waco and another six miles distant from the municipal water intake. He urged the Commission that "assimilation" and "dilution" of any pollutants from the dairy "would occur long before the water reache[d] Lake Waco," or at least before it reached the intake.

The executive director did not elaborate on the factual basis for these assertions other than to reference an attached map that illustrated the distance between the dairy, Lake Waco, and the intake. No further explanation is provided as to why or how the Commission should infer from the bare fact of distance that any pollutants would "assimilate" or "dilute" during transport. Even if

---

[23] And we intend no comment regarding the scope of the Commission's discretion in making such determinations or the procedures it may apply.

the unsworn assertions of the Commission's executive director could otherwise be considered "evidence," these sorts of unsupported factual conclusions cannot support a reasonable inference that those facts exist. *See, e.g.*, *Coastal Transp. Co., Inc. v. Crown Cent. Petroleum Corp.*, 136 S.W.3d 227, 233 (Tex. 2004) (observing that "conclusory or speculative" opinions are "'incompetent evidence' . . . [that] cannot support a judgment"); *Dallas Ry. & Terminal Co. v. Gossett*, 294 S.W.2d 377, 380 (Tex. 1956) ("It is well settled that the naked and unsupported opinion or conclusion of a witness does not constitute evidence of probative force and will not support a jury finding even when admitted without objection."); *Casualty Underwriters v. Rhone*, 132 S.W.2d 97, 99 (Tex. 1939) (holding that "bare conclusions" did not "amount to any evidence at all," and that "the fact that they were admitted without objection add[ed] nothing to their probative force"); *see also Burrow v. Arce*, 997 S.W.2d 229, 235 (Tex. 1999) ("[I]t is the basis of the witness's opinion, and not the witness's qualifications or his bare opinions alone, that can settle an issue as a matter of law; a claim will not stand on the mere *ipse dixit* of a credentialed witness.").

Beyond its executive director's unsworn and unsupported conclusions regarding "assimilation" and "dilution," the Commission points to tacit acknowledgments by the City's expert Wiland that natural assimilation or dilution may have *some* impact on pollutants while being transported in a waterway. But this fact, without more, cannot support a reasonable inference that waste, nutrients, or pathogens from the dairy would assimilate or dilute to an extent that they would have *no* effect in Lake Waco or when they reached the City's municipal water intake. *See Flores*, 74 S.W.3d at 542 (agency acts arbitrarily in making fact findings unsupported by any evidence).

Next, the Commission cites the undisputed fact that algal growth in Lake Waco may be influenced by factors other than phosphorus loading from dairies upstream in the North Bosque watershed, such as climate, light, loadings of nutrients other than phosphorus, and loadings

71

of phosphorus from sources other than dairies. However, the bare fact that there may be multiple factors contributing to algal growth in Lake Waco does not, in itself, support a reasonable inference that phosphorus loading from dairies, such as that which would occur under the amended O-Kee Dairy permit, would be excluded as one of those contributing factors. Nor would this "evidence" controvert the City's evidence that the amended permit, unless modified, would exacerbate the problem. Consequently, the Commission would have acted arbitrarily in relying on such an inference. *See City of El Paso*, 883 S.W.2d at 184 (agency acts arbitrarily in relying on irrelevant factor); *Starr County*, 584 S.W.2d at 356 (agency acts arbitrarily if there does not "appear a rational connection between the facts and the decision of the agency").

Finally, the Commission purports to rely on "evidence" that there is no causal relationship between algal proliferation in Lake Waco and the taste and odor problems of which the City complains. The Commission points to acknowledgments by the City that the taste and odor problems existed to some extent even prior to the modern growth of the dairy industry in the North Bosque. This fact, however, does not in itself support a reasonable inference that there is no causal connection between such problems and algal growth, much less controvert the City's evidence of that causal connection and that the problems have worsened with the modern growth of the dairy industry.

The Commission also relies on a statement in its responses to public comment on the proposed TMDLs. The City had complained that the proposed TMDLs were focused too narrowly on water quality in the two "impaired" segments of the North Bosque and should have also taken into account conditions in Lake Waco. In response, the Commission asserted, in part, that "[w]hile nutrient conditions in the lake may have some indirect influence on taste and odor episodes, there

is no demonstrated linkage to assure that reducing nutrient concentrations will reduce or eliminate taste and odor episodes. Other Texas reservoirs with similar and higher nutrient and algae levels do not experience taste and odor problems." As with its executive director's argument, the Commission provides no evidentiary support for these conclusions. Consequently, they are no evidence of the asserted facts. *See, e.g.*, *Coastal Transp.*, 136 S.W.3d at 233; *Burrow*, 997 S.W.2d at 235; *Gossett*, 294 S.W.2d at 380; *Rhone*, 132 S.W.2d at 99.

## CONCLUSION

In sum, the Commission acted arbitrarily and abused its discretion in concluding that the City was not an affected person with respect to the O-Kee Dairy permit application and denying its hearing request. *See City of El Paso*, 883 S.W.2d at 184; *Gerst*, 411 S.W.2d at 354; *Flores*, 74 S.W.3d at 541; *Starr County*, 584 S.W.2d at 356; *see also Rodriguez*, 997 S.W.2d at 255 ("If the Commission does not follow the clear, unambiguous language of its own regulation, we reverse its action as arbitrary and capricious."). Accordingly, we reverse the district court's judgment affirming the Commission's order, reverse the Commission's order, and remand to the Commission for further proceedings consistent with this opinion.

_____

Bob Pemberton, Justice

Before Justices Patterson, Puryear and Pemberton;
   Justice Patterson Not Participating

Reversed and Remanded on Rehearing

Filed:   June 17, 2011